# ⸸ Geddis *against* Hawk.

A creditor is not bound to resort to the principal for the collection of his debt, in the first instance; nor is he bound to resort first to a lien which secures his debt, but he may sue and recover from a surety.

What a surety may and may not avail himself of as an equitable defence.

WRIT of error to the common pleas of *Lebanon* county.

This was an action of debt by *Robert Geddis* and *Samuel Carper* surviving *John Wolfersberger*, against *Jonas Hawk* surviving executor of *Michael Hawk* who was a joint and several obligor with *Adam Hawk*.

The plaintiff gave in evidence two bonds, dated the 3d April 1810, given by *Adam Hawk* and *Michael Hawk* to *Robert Geddis*, *Samuel Carper* and *John Wolfersberger*, conditioned for the payment of 471 pounds 1 shilling and 4 pence, on the 1st April 1814, and the 1st April 1815.

The defendant then gave in evidence the record of the proceedings of the orphan's court of Dauphin county, for the sale of the real estate of *John Carper* deceased, purchased by *Adam Hawk*, for which he gave the said two bonds with *Michael Hawk* as his security; and offered to prove " that the plaintiffs in the above suit, the administrators of *John Carper* deceased, have not and do not resort to the aforesaid lands so sold for the recovery of the money due on said two bonds, or take such legal means as they in law and equity should do to make the said money, from said lands, *so sold* as aforesaid: That *Adam Hawk* and wife sold and conveyed one hundred and fifteen acres and one hundred and one perches of the land to *Peter Witmer*, in the spring of 1817, and received a large sum of money, say about 8000 dollars in hand, and took bonds for the residue; and also sold the residue of said lands to *Philip Gruber;* and all this with the knowledge, and under the very eyes of the plaintiffs in this cause, who made no request of payment thereout, nor did they make any objections to the sale or transfer of title to said land; that *Michael Hawk*, the surety in said bonds, died, having first made his last will in writing, and therein appointed *Jonas Hawk* and others executors thereof; that probate was had of said will at Lebanon, in the county of Lebanon; that these executors gave due and public notice to all the creditors of *Michael Hawk* deceased, to bring forward and exhibit their claims and demands according to the provisions of the act of the general assembly, entitled an act directing the descent of intestates' real estates and distribution of their personal estates, and for other purposes therein mentioned, passed the 19th day of April 1794; and that these plaintiffs, residing in the same neighbourhood,

[Geddis v. Hawk.]

never made any exhibit of these bonds now in suit, or demand of their amount, of or from the executors of said *Michael Hawk* deceased, but suffered the said executors to settle off his estate and pay the same over to the legatees without claim, demand or objection; that the said *Peter Witmer* placed his son *John Witmer* in the possession, use and enjoyment of the said lands so by him purchased of *Adam Hawk*, in the year 1817, who resides thereon ever since. That *Robert Geddis* was the most active administrator of *John Carper* deceased, and did the principal part of the business in settling his estate, and made and signed a notice in writing, which he sent to *John Witmer* in the year 1819, stating as follows:

" Sir, Please to take notice, that two bonds remain in my hands unpaid, given by *Adam Hawk* and *Michael Hawk*, unto *Robert Geddis, Samuel Carper, John Wolfersberger*, administrators of *John Carper* deceased, of Londonderry township, in the county of Dauphin, now Lebanon; the one dated the 3d of April 1810, conditioned to pay the sum of 470 pounds on the 1st of April 1815, and the other thereof is dated the 3d of April 1810, conditioned to pay the sum of 470 pounds on the 1st of April 1814, which said bonds were given by *Adam* and *Michael Hawk* as part of the purchase money of a certain plantation and tract of land, situate in Londonderry township, now a part in Lebanon and a part in Dauphin county, which you purchased from the said *Adam Hawk* some time in the year 1816 or 1817; you will therefore please to take notice, and not pay any more money on account of the said purchase, as I will look to the lands for the payment of the two bonds."

" That having received the above notice, *Peter Witmer* has retained in his hands near 4000 dollars of the purchase money which he was to pay *Adam Hawk* for said land, and it is lying useless and dead ever since, all which evidence was objected to by the plaintiff, and the court overruled the objection and admitted the evidence. To which opinion of the court the counsel for the plaintiff did except."

The defendants then further gave in evidence the discharge of *Adam Hawk* as an insolvent debtor, of 5th of August, and 7th of November 1822. When the plaintiffs, to maintain the issue on their part, gave the following evidence: the will of *Michael Hawk*, dated 14th of September 1813, and probate thereof; and then called *John Gloninger*, Esq., who being sworn, did say, I drew the deed from the administrators to *Adam Hawk*, in March 1817: I do not believe that any money was paid by *Adam Hawk* at the time of its execution at my house. It is usual to give such a receipt as this on the deed, when bonds are given for the gales: I saw no bonds there. I drew the agreement between *Adam Hawk* and *Peter Witmer*, and discovered then the defect in the deed written by *Hollingsworth*, from the administrators of *Carper* to *Adam Hawk*, and I informed the parties that the deed was defective. That it contained no grant, &c., and they and Mr *Wright*, the counsel for *Adam Hawk*, agreed that I should draw another deed from the administrators to *Adam Hawk*.

2 L

[Geddis v. Hawk.]

I did so; and the administrators came and executed the deed willingly without making any objections. Some money was paid by *Peter Witmer* to *Adam Hawk*, on the 3d of April 1817, when the deed was executed; but how much I cannot remember. *Michael Hawk*, I think, lived with *Adam Hawk* when I drew his will in 1813, but I am not sure. I cannot say particularly the very words used by *Michael*, when he gave me instructions to draw his will, but the substance was, that *Adam Hawk*, his son, had received his share of his father's estate, either in the place at Camblestown, or in the money paid for it, I cannot remember which; I had asked him the reason he omitted to name *Adam* in his will. I drew the recitals in the deed from the deed of *Hollingsworth's* drawing. The receipt would imply that some money was paid at the time of executing it, but I cannot remember that I saw any money paid; there might have been money paid without my recollecting it. There was nothing said about the purchase money being unpaid. It was intended that *Peter Witmer* should have a full and clear title. The administrators were not present at any time. The object of the new deed was merely to cure the defect in the first one; not to warrant or guaranty any title. There was nothing said to the administrators about *Peter Witmer;* I stated to them nothing about him or his title, but merely the defect in the first deed, which contained no conveyance. The bond of indemnity was executed at the same time that the deed from *Adam Hawk* to *Peter Witmer* was executed; the bond was given to indemnify *Witmer* against all claims whatsoever. I do not remember —— particularly, or that any thing was said about the incumbrance of the lien of the purchase money; it was to secure to *Witmer* a full and clear title. The plaintiff then offered the bond of indemnity, and gave it in evidence, dated 3d of April 1817, from *Adam Hawk*, *Martin Thomas* and *John Wolfserberger*, to *Peter Witmer*, for the sum of 5215 pounds, to indemnify *Peter Witmer* against all claims and incumbrances on the land he purchased from *Adam Hawk*, prout the bond : and further, the plaintiff gave in evidence a full exemplification of the record of the proceedings in the orphan's court of Dauphin county, for the sale of the land of *John Carper* deceased, to *Adam Hawk*. It was then admitted by the parties, that about 4000 dollars were retained by *Peter Witmer* after *Robert Geddis's* notice to him, say two bonds, 738 pounds 2 shillings and 6 pence, each payable in 1819 and 1820. The plaintiff further gave in evidence the record of the suits Nos. 15 and 16, to November term 1818, by the administrators of *Carper* against *Adam Hawk*, on the bonds in this suit and judgment thereon; and here the defendants, to show that the bond of indemnity was only intended to embrace judgments and mortgages against *Adam Hawk*, and not the lien for the purchase money, offered in evidence the records of certain judgments, &c. against *Adam Hawk*.

Here Mr *Norris*, for the plaintiffs, offered and tendered to the defendant, an assignment of the rights of the plaintiffs to proceed against

the fund fixed by the sale in the orphan's court, dated 7th of August 1829. The defendant then gave in evidence the record of two suits Nos. 23 and 24, to November Term 1821 : a *scire facias* and an ejectment, and *non pros.* of writ of error. And here the testimony closed and the counsel for the plaintiff submitted to the court the following points.

1. That the bonds in suit are joint and several, and that *Robert Geddis* and *Samuel Carper* have in law a perfect right to sue *Michael* or *Adam Hawk*, or their representatives, for the money, and that the suit may be commenced against both or either at the election of *Geddis* and *Carper.*

2. That *Michael Hawk* having signed, and sealed and delivered these bonds as his act and deed, is bound in law to pay the money on the day fixed, and if he seek to be relieved from the penalty of the bonds, he must show and prove actual payment, or that in equity and good conscience it ought not to be paid.

3. That as there is no evidence of the actual payment of the money, or pretence of payment set up by the defendant, his defence entirely rests upon circumstances, and the equity they pretend to establish. ·

4. That if from the evidence of *Frederick Wolfersberger,* *John Gloninger* and the will of *Michael Hawk,* together with the relation of the parties, the jury believe that *Michael Hawk* signed and sealed these bonds given for the half of the purchase money of the lands bought by *Adam Hawk* from the administrators, with the view, and for the purpose of advancing his son *Adam,* and of making these bonds his son *Adam's* share of his estate, then in that case *Michael Hawk* was not the surety but the principal in the bonds.

5. That *Adam Hawk* is not named in his father's will : and as there is not a word of testimony or proof in the cause that *Adam* ever received any thing from his father on account of his share in the estate, and as there is the clear and full proof of *John Gloninger,* who drew the will, that *Michael Hawk,* when he gave directions for making his will, gave as a reason for excluding *Adam,* that *Adam* had his share in the Campbell's town land, or when it was bought he had his share—There is, from all these facts and circumstances, manifest proof that *Michael Hawk* was not, or cannot be considered in the light of a surety.

6. That if *Michael Hawk* was but a surety in these bonds, he is not discharged, because neither he nor his executor ever called upon *R. Geddis,* or *Carper,* or *Wolfersberger,* requesting them to sue *Adam,* or telling them if they did not sue *Adam Hawk,* he, *Michael Hawk,* or his executors, or his estate would be considered as discharged : that nothing but a positive request made by the surety upon the creditors, and this request clear and fully proved, can discharge a surety.

7. That the proceedings in the orphan's court of Dauphin county give a good and perfect title to *Adam Hawk* for the land he bought ;

[Geddis v. Hawk.]

and the deed by the administrators, made in pursuance of the orders of the orphan's court, is but the evidence of the record of the sale and confirmation, and this deed does not, nor could not, without the actual payment of the purchase money, discharge the land of the lien and charge of the purchase money fixed by the statute of 2d April 1804.

8. That *Peter Witmer* was a purchaser from *A. Hawk* with full notice of the balance of *Hawk's* purchase money remaining a lien upon the land; that he had notice of the act of 1804 and of all the proceedings had in the orphan's court recited in his deed; that having this full notice he takes a bond of indemnity from *Thomas* and *Wolfersberger* to secure him against all peril and loss, and that in the language of the supreme court in this cause, "in every view, he, *Peter Witmer*, stands in the situation of *Adam Hawk*, and has no peculiar equity."

9. That the evidence of the notice served in 1829 by the administrators of *Carper* upon *Peter Witmer*, not to pay over to *Adam Hawk* the balance of his purchase money, and the call in the newspapers of February 1817, by the executors of *M. Hawk*, for the creditors to present their demands, are not, in equity, circumstances that can discharge the estate of *Michael Hawk* from the payment of the money, and that such is the law laid down by the supreme court in this cause.

10. That by the circumstances given in evidence on this trial, the plaintiffs are entitled and have a right, in law and justice, to a verdict at all events, upon the condition of assigning to the administrator of *Michael Hawk*, all their right and remedies to the lands, and the lien and charge remaining upon them, and waiting with the execution in this suit, until the defendant proceed at his own cost against the land, and exhaust it.

11. That from the evidence given upon this trial, and from the tender now made by *Robert Geddis* and *Samuel Carper* of the assignment by their deed of all their right and their remedies to the administrator of *M. Hawk*, to substitute him in their place and clothe him with all their securities relating to the real fund, and from their offer to file this deed of assignment under the direction of the court of record in this cause, upon their obtaining a verdict, either conditional or absolute—From all this evidence and from this tender, the plaintiffs *Geddis* and *Carper* are entitled to an absolute verdict.

And the defendants submitted the following points.

1. If the jury believe the evidence given on this trial, viz.—Proceedings of orphan's court to sale of the lands; bonds in suit taken for part of the purchase money on such sale, and *Michael Hawk* surety in the bonds, plaintiffs giving the deed to *Adam Hawk*, 24th March 1817, the death of *Michael Hawk* in 1815. Notice to creditors on the 15th of February 1817, by the executors to *Michael Hawk*, and no demand ever made of them by plaintiffs this suit brought. Notice by *Robert Geddis* to *Witmer*, who bought of *Adam Hawk*, with

the knowledge not to pay *A. Hawk* the money due for the land, but that the plaintiffs would look to the land for the payment of these bonds, and *Witmer* keeping back the money, will not these acts of plaintiff discharge the surety *Michael Hawk,* and his estate, from the payment of the bonds?

2. That if the jury believe, that plaintiffs knew that *Adam Hawk* had sold to *Peter Witmer,* by articles of agreement; that when the deeds and title papers were brought to Judge *Gloninger* to draw a deed from *Adam Hawk* to *Witmer,* that the judge discovered the omissions and imperfections in the deed, 6th April 1811, by the said administrators to *Adam Hawk;* that the said administrators were told of these imperfections, and requested to execute a new deed, and knew that *Witmer* had bought the lands from *Adam Hawk;* that they executed the deed of the 24th of March 1817, without saying a word about the bonds on which this suit is brought remaining yet unpaid, and this being after the death of *Michael Hawk,* the surety; that they executed the last deed without making any exertion, or in any manner whatsoever attempting to have these bonds paid out of the hand money, to be paid by *Witmer* to *Hawk,* all these bonds being then due: that these facts, if found by the jury, would discharge *Michael Hawk* as the bail or surety in these bonds from the payment of the bonds.

3. That the two suits to November term 1818, No. 15 and 16, and *fieri facias* and levy, are a discharge of the debt, and show the debt satisfied; that this suit is a bar to any other suit; that the plaintiffs, having omitted to notify and bring in the terre tenants upon the record, so as to make the lands liable for the purchase money, *Carper's* administrators have put it out of the power of *Michael Hawk's* representatives ever to resort to the lands by any action, either in law or equity, and therefore plaintiffs in this suit ought not to recover.

The court, upon the points submitted by the plaintiffs, charged the jury as follows. That the first, second and third points, as stated, were the law. That the fourth point was the law, but that evidence had been given to show that *Michael Hawk* was the surety in the bonds; and whether he was surety or principal, was a matter of fact for the jury to decide. That the sixth and seventh points are the law. To the eighth point the court charged, that *Peter Witmer* was a purchaser from *Adam Hawk.* The proceedings in the orphan's court recited in his deed, are notice to him that by the act of the 2d of April 1804, the balance of the purchase money, if any remained due by *Adam Hawk,* was a lien on the land, and with this notice he takes a bond of indemnity from *A. Hawk, Thomas* and *Wolfersberger* to secure him against all claims on the land. Therefore *Peter Witmer* stands in the situation of *Adam Hawk,* and has no peculiar equity. That the ninth and tenth points are the law. On the eleventh point the court charge the jury: that from all the evidence as stated on this point, together with the tender of plaintiffs' deed

to the administrator of *Michael Hawk*, the plaintiffs were not enti-tled to an absolute verdict, if the jury should be of opinion from the evidence in the cause, that *Michael* was only the surety in the bonds. But if the jury should be of opinion that he was a principal in the bonds, and not the surety, then, unless they are satisfied that he has by payment or otherwise been discharged from liability on the bonds, they ought to find an absolute verdict in favour of plaintiffs.

Upon the points submitted by defendant, the court charged the jury, that they were not the law ; that there was no evidence that plaintiffs knew of the bargain between *Peter Witmer* and *Adam Hawk*, or the payment of the money.   The errors assigned were, the admission of defendant's evidence ; and that the court erred in refusing to instruct the jury, that the whole of defendant's evidence did not amount to an equitable defence. .

*Norris*, for plaintiff in error; cited : *4 Johns. Cha. Rep.* 123; *9 Serg. & Rawle* 16 ; *1 Penns. Rep.* 425; .10 *Serg. & Rawle* 142 ; *3 Binn.* 520 ; *15 Serg. & Rawle* 107 ; *1 Rawle* 29 ; *2 Pick.* 581 ; *3 Wash. C. C. R.* 70 ; *8 Serg. & Rawle* 112 ; *10 Serg. & Rawle* 33 ; *16 Serg. & Rawle* 29 ; *13 Johns. Rep.* 174 ; *15 Johns. Rep.*. 443 ; *17 Johns. Rep.* 384 ; *2 Pick.* 584; *8 Serg. & Rawle* 452, 484 ; *13 Serg. & Rawle* 157 ; *8 Pick.* 122 ; *15 Serg. & Rawle* 118.

*Weidman* and *Elder*, for defendant in error.

The opinion of the Court was delivered by

GIBSON, C. J.—The argument has brought into review our for-mer determination of this cause, the defendant insisting on the policy of adhering to precedents, even when the principle of them is wrong.   Though the doctrine of *stare decisis* is of undoubted obliga-tion ; yet there seems to be a substantial difference between changing an admitted principle, and overruling a decision which is but evi-dence of it ; the former partaking of legislation, which. is foreign to the business of the judiciary, while the latter is incontestably within the pale of its authority.   On this distinction alone can the blunder of a court of the last resort be remedied, even by awarding a new trial for misdirection ; or the mischief of a bad precedent be abated. It is not very unusual to depart from an erroneous decision, which has not yet grown to be a rule of property, especially while the error may be nipped in the bud, and its consequences be arrested in the cause in which it was committed.   Still, when such a. decision has gone to the profession for the guidance of their clients, it ought not to be lightly departed from, even in the same cause.   But where it can be sustained only by the sacrifice of a principle, or the overthrow. of a decision more consonant to the jurisprudence of the land, it is not the privilege, but the duty of the judges to recur to fundamental principles.   To determine the fitness of a case for such recurrence, is the most delicate task that can be set before a judge, and one

[Geddis v. Hawk.]

which calls for all his prudence and discretion.  This much, how-
ever, may be safely said, that to doubt of the propriety of such re-
currence, is to make manifest the propriety of abstaining from it ;
but that to explode a pernicious principle founded in a decision pal-
pably erroneous, can never be a measure of doubtful propriety.
Before proceeding, in accordance with these precautionary principles,
to reconsider our former judgment, it is proper to remark, that the
point on which it was made to turn, was suggested by the judge
who delivered the opinion of the court, at a late period of the argu-
ment, and adopted in a press of business by a bare majority of the
bench.

That a creditor is not bound to apply his securities, or resort to
the principal in the first instance, is a conceded result of the prece-
dents and practice of courts of equity here and elsewhere.  What
more is there in the case to affect these obligees ?  They incurred no
disability to sue the principal obligor ; parted with no means of ob-
taining satisfaction from him ; disregarded no monition of the surety ;
impaired no security ; nor did any other act or thing which is usually
supposed to dissolve the contract.  Nothing of the sort is pretended.
They said nothing or did nothing but reform their imperfect convey-
ance—a thing they were compellable to do, and warn a subsequent.
purchaser from the principal debtor of a lien which the law had
created for the security of their debt.  It is said, however, that in
supplying the defects of the original conveyance, they parted with
the means of *extorting* satisfaction from the principal, or the pur-
chaser under him.  But they were bound, not only by the terms of
the contract, but by every principle of common honesty, to do what
accident had prevented them from doing effectually in the first in-
stance.  The defect in the first conveyance was so palpably the
effect of accident, that no chancellor would have hesitated to amend
it without terms, or superadded consideration : and what more was
in fact done ?  A formal receipt for the purchase money was ap-
pended, which, it has been said, might impair the lien, or even dis-
charge it, by having induced the subsequent purchaser to involve
himself in responsibilities for the defendant to third persons, under a
belief that the plaintiffs were paid.  But it is conceded that enough
to answer the demand is still in his hands ; though, it is said, he
may have precluded himself from a defence to his bonds by having
encouraged a holder, for value, to take an assignment of them.  A
decisive answer to this is, that there is no evidence of any thing of
the sort in the case ; and a surety is not to be released for a possible
or speculative injury.  But viewing this receipt, not as a duplicate
of that appended to the imperfect conveyance, as it really was, but
as an original ; it afforded no room for an inference of actual payment,
or of any thing beyond the substitution of an independent security
for the debt created by the contract of purchase.  It is a notorious
practice, in transactions of this sort, to subjoin a receipt for purchase
money, not paid, but secured by a bond or mortgage taken in satis-

faction of the original contract.    It is not pretended, however, that
the statutory lien was gone, but that the release, being at least evi-
dence of payment, might have embarrassed the surety in the en-
forcement of the lien, had he succeeded, by subrogation, to the own-
ership of it ; and the interposition of any perceptible obstacle to his
recovery, on any one of the original securities, is supposed, on the
authority of *Hayes* v. *Ward,* 4 *Johns. Ch. Rep.* 123, to operate a dis-
charge of him. . To be sensible of the difference between that case
and the present, it is necessary but to advert to its features.    A
surety who had been arrested in a neighbouring state, and probably
with a view to extort payment from his supposed inability to procure
bail, brought a bill for an injunction, charging that a collateral se-
curity taken by the creditor had been secretly tainted with usury by
the immediate parties to it ; and the allegation of this essential fact
was not contradicted in the answer.    That collusion with the princi-
pal gives the surety an equity, is not to be contested ; for it must
stand indifferent whether the security, on the credit of which the
surety was drawn into the contract, has been impaired by the credi-
tor subsequently, or in its concoction.    The authorities show no
difference ; and the wonder, therefore, is, that instead of ordering
the security to be put to the test of experiment, by an action on it,
the creditor was not perpetually enjoined.    The chancellor seems to
have considered his omission to answer this part of the bill, not as a
confession of it, but a circumstance that cast a suspicion on the re-
spondent's title which it was incumbent on him to remove by a legal
proceeding ; and the business of doing so seems not to have been
imposed as a duty, but accorded as an indulgence.    Now what is
the case before us ?    The vendors had appended to the conveyance
the usual receipt for the purchase money, which, though competent
to go to a jury, is destitute of effect, as evidence of actual satisfac-
tion ; and whether this were done before the relation of principal and
surety was constituted, is, on the principle of *Hayes* v. *Ward,* en-
tirely immaterial. ·  If the existence of such a receipt alone were to
discharge the surety, the intent of the parties would be frustrated in
all cases ; for the practice of delivering an acquittance with the con-
veyance, at one time supposed necessary, perhaps to release the title
from an equitable lien for the purchase money, is so general, as to
seem, to the popular apprehension, a formal part of the act of exe-
cution.    But what impediment could it offer to an action on a bond,
or other security, taken at the date of the receipt, or previously ?
The almost insensible presumption to which it gives rise, would be
rebutted by the universality of the practice to which it owes its ex-
istence.    I, therefore, turn from these considerations, mainly relied
on in the argument, to those relied on by the majority, of which I
was one, in the former decision.

It is not easy to ascertain, from the report, the specific ground on
which the supposed equity was put.    It seems to have been taken
for granted that the receipt would not preclude the vendors, or the

[Geddis v. Hawk.]

surety in their stead, from showing the lien to be unsatisfied ; and that the subsequent purchaser stands, in relation to it, as did the principal debtor, his predecessor in the ownership of the land.   Neither was it asserted that the creditor is bound, on any general rule of equity, to proceed against the principal, in the first instance, or exhaust a fund liable to satisfaction, before resorting to the principal, or surety, at his pleasure.   The decision seems to have been rested mainly on a principle borrowed by the chancellor, in *Hayes* v. *Ward,* from *Wright* v. *Nutt,* 1 *H. Bl.* 136, on which last case we are forbidden to rely as a precedent, and the foundation of which it is, therefore, the more necessary to examine.   Had the principle of *Wright* v. *Nutt* not found its way into our jurisprudence through the decision of a court eminently entitled to respect, its authority would not now have been a subject of discussion.   In that case the prayer of the bill was, to be protected from an action at law, till the creditor should have exhausted his means of obtaining satisfaction from the debtor's estate, confiscated by an act of attainder passed by the legislature of Georgia, but subject to the demands of those who were friendly to American independence ; to which class the prosecuting creditor belonged.   An injunction was granted ; and the first thing to be remarked is, that the decree distinctly overruled *Holditch* v. *Mist,* 1 *P. Wms* 695, to say nothing of *Kempe* v. *Antill,* 2 *Bro. Cha. Rep.* 11 ; and that it has, in turn, been shaken to its foundation, if not overruled, by *Wright* v. *Simpson,* 6 *Ves.* 714.   It is fair, however, to say, that it seems to have received countenance in *Cottin* v. *Blane,* 1 *Anstr.* 544.   That it is entitled to as little respect on the foundation of principle as of precedent, may be inferred from the reasons given in support of it.   As in the case of our former determination of the present cause, it is not easy to ascertain the specific ground on which the decision was rested.·   There was no proof of collusion between the creditor and the American commissioners, even if there could have been such a thing : and the suggestion in the note to *Kempe* v. *Antill,* that the creditor " had actually made application, but had not *diligently* or *honestly continued* that application," affords no colour for the conclusion attempted from it, unless it be taken for granted that the creditor was bound to make the application in the first instance ; and that would bring the argument round to the point from which it started—an assumption of the principle to be sustained.   Subsequently to his application to the commissioners, the creditor had gone into a court of law to enforce an undisputed legal right against the person of his debtor, and was restrained ·for no reason, that I can discover, but the existence of a fund within his power, the benefit of which he was required to procure in violation of the spirit of his country's laws, for one who was disabled by those laws from procuring it for himself.   That this had been previously deemed a sufficient reason to control a legal right, was not pretended. The existence of a pledge, or other security, had never been allowed to prevent an immediate recourse to the person ; and it certainly

2 M

[Geddis v. Hawk.]

could not make a difference favourable to the argument, that the pledge, in the case before the court, was not reserved by the parties, but interposed by a superior power, without the consent of the creditor. The decree may, it seems to me, be fairly set down to the score of the instinctive repugnance of courts of justice to measures of violence and wrong, inseparable from political convulsions. Something, too, may be allowed to national excitement at the disastrous result of a civil war pregnant with bitter recollections. But though it might have been fair in the mother country to say, "Since you will not permit the demands of creditors who were favourable to our authority to be satisfied out of the debtor's property within your grasp, we will not suffer his person or effects to be molested here, by those who were favourable to your independence;" still, such a measure of retaliation would have come with a better grace from the legislature, than from the courts. In fact, a bill for the purpose was brought into parliament, but dropped, on an intimation given by Lord *Thurlow*, that the powers of the chancellor were adequate to the object. A decree thus produced is certainly an insecure foundation for a permanent principle of new and specific equity. But allowing it the effect of a precedent, what does it prove? Not that the existence of a fund which would be as accessible to the surety as it is to the creditor, controls the right of resorting to the person. Such a doctrine would compel the creditor, in every instance, to apply his lien or other security, in the first place, and exhaust the fund wherever he could approach it. There may possibly be extreme cases in which a suit at law would be restrained as vexatious and oppressive— as when the creditor has but to hold out his hand to receive his debt from a fund in court—but that is not our case; nor is it pretended that there is any personal disability, on the part of the surety, to deprive him of any benefit from the lien which the creditor himself could have from it; so that the groundwork of *Wright* v. *Nutt*, which suggested the principle of *Hayes* v. *Ward*, is entirely different from that which we have here.

But the chancellor, in *Hayes* v. *Ward*, declared that cases of the sort are to be determined, not on any rule analogous to that of the civil law, but on their special circumstances; and what have we here to throw the vendors on their lien as a primary resort? The operative one is said by the judge who declared our opinion, to be the warning given to the subsequent purchaser, of the existence of the lien and the purpose of the vendors not to relinquish it; which seems to have been considered a taking to the land exclusively, that bound them on principles of election, by reason of its supposed tendency to lull the surety, and prevent him from taking measures of security in respect to the principal. That a creditor is bound to elect between friends or persons concurrently liable, or is compellable to pursue exclusively the one to which he first has had recourse, will not be pretended. In the movement of the vendors for the preservation of their lien, there was nothing to disarm the surety, or

[Geddis v. Hawk.]

that would not have been understood by a man of ordinary sagacity. So far from holding out to him an assurance of exemption, the notice evinced but a prudent attention on the part of the vendors to the preservation of all their securities.    I will not say, that a subsequent purchaser of a title derived through an order of sale by the orphan's court, is not bound to take notice of the lien, or that warning him of it was not superfluous ; but the course pursued was at least an honest one, and proper to apprise him that a part of the purchase money was still unpaid ; especially as a formal receipt had been given when the period of payment fixed by the conditions of the sale had elapsed. It was by no means inconsistent with the vendor's duty to the surety : for it is not easy to see how the latter could be prejudiced by a measure taken for the common benefit, and thought, though perhaps erroneously, to be necessary to his protection.    I am not prepared to say that notice was indispensable to the preservation of the lien, as a knowledge of its original existence might be sufficient to put a purchaser on inquiry as to the fact of its subsequent extinction ; or that the vendors were bound to more, as regards the surety, than abstinence from positive acts that would impair it : but clearly the notice, being a measure of extreme caution, for the benefit of all parties, ought not to have inspired the surety with an expectation of exemption.    But no prejudice was in fact suffered by him ; for it is not pretended that he was induced to forego the use of any means to procure indemnity from the principal ; and as to the defendant, his executor, it is sufficient that the assets are yet in his hands. Even were they not, the distribution of them, without having taken refunding bonds, would have been such negligence as to preclude a defence on that head.    Evidence of the facts contained in the notice of special matter, furnishing as they did no substantial defence, ought therefore not to have been admitted.    As to the other branch—that the claim was not preferred within the period of the publication of notice, fixed by law for the creditors to come in—that would be made available only by showing the assets to be deficient, which is not pretended.    Notwithstanding our repugnance to depart from a previous decision, therefore, we are satisfied that justice requires the cause to be put before another jury.

Huston, J.—This cause has been before this court twice before, and is reported in 10 and 16 *Serg. & Rawle.*   The decision of the court in the first report turned on whether the bonds in suit were joint, or joint and several, and is certainly not free from difficulty. The construction there put on those bonds is not, I think, supported by any authority; and the insertion of the words, " *each of us,*" after the names of the obligors, is a liberty with the contract of the parties, which courts do not often assume ; and this decision is, I think, inconsistent with subsequent cases.

The opinion of the court in the present instance directly overrules that given by this court in 16 *Serg. & Rawle ;* and does more, for

the facts are brought before us in the present instance more fully, than they were in that case.    I do not know that I would trouble the profession with a dissenting opinion, were it not that this is the second instance at this adjourned court, in which a bare majority of the court have overruled a prior decision in the same cause.   No doubt every court which has ever existed has given decisions which, on reflection, require correction.    Much and full reflection ought, however, to be given by the court which overrules a prior decision of its own, given in the same cause, between the same parties, on the same facts.   This, says chancellor *Kent*, ought never to be done, but on the most cogent reasons.    In the present case the facts are not the same, but where they differ they make a stronger case for the defendant.   After the plaintiff had read his two bonds, payable on the 1st of April 1814, and on the 1st of April 1815, and the receipts indorsed on them, he rested.

The defendants then gave in evidence the petition of the heirs of *John Carper*, praying for a sale of the lands of said *John*, which had been valued, and which his heirs had refused to take at the valuation.    The court ordered said lands to be sold on the 16th of March 1810, on the following conditions; *one half the purchase money to be paid in hand, and the residue in five equal annual payments.*    At an orphan's court, 1st of May 1810, the administrators reported a sale to *Adam Hawk* of one hundred and sixty-seven acres and ninety-one perches, at 26 pounds 7 shillings and 6 pence per acre—and other parcels to different purchasers.    "*All sold on the terms in said order prescribed.*"    The report was approved, *and the court decreed "that the sale, so* as aforesaid made, be and remain firm and stable for ever."    Not one word about when the deed was to be made, in the record.

The record then, as presented to us in the paper book, states, that defendants offered in evidence the matters contained in the notice of special matter.

It will be observed, that this does not purport to be the whole of the offer, but only the part objected to.    What the rest was we know not.    After the court had received the testimony so offered, the defendants gave in evidence the records of common pleas of Lebanon county of the 5th of August and 7th of November 1832, showing the discharge of *Adam Hawk* as an insolvent debtor.

The plaintiff then gave in evidence the will of *Michael Hawk*, dated 14th of September 1813, and probate in 1815; and called *John Gloninger*, who proved that he drew the deed from the administrators of *John Carper* to *Adam Hawk* in March 1817; that he believed no money was then paid; that it is usual to give receipts such as this when bonds are taken for the gales; that he saw no bonds; that in drawing the deed from *Adam Hawk* to *Wilmer* he discovered the defect in a former deed to *Adam Hawk*, drawn by *Hollingsworth*, that contained no words of grant, &c.; and informed the parties that *Adam Hawk* and his counsel directed him to draw another deed from *Carper's* administrators to *Adam*, which he did, and the administra-

[Geddis v. Hawk.]

tors came and executed the deed willingly without making any objection. After stating something not material about *Michael Hawk's* will, he said the receipt would imply that some money was paid at the time of executing the deed. (By referring to the deed, the receipt was in these words, " *Received on and before the date of the* within written indenture from the within named *Adam Hawk* the sum of 4700 pounds 17 shillings and 6 pence lawful money of Pennsylvania, it being the full consideration money on the said indenture mentioned." Signed by the three administrators.) But he remembered nothing of any being paid.- " There was nothing said about the purchase money being unpaid." He then proved something about the bond of indemnity given by *Adam Hawk, Martin Thomas,* and *John Wolfersberger* to *P. Witmer,* which bond was read, dated 3d of April 1817, the same day as the deed of *A. Hawk* to *Witmer.* The plaintiff then gave in evidence again the full record of the proceedings in the orphan's court of Dauphin county respecting *John Carper's* lands.

It was then admitted by the parties, that about 4000 dollars were retained by *Witmer* after *Geddis's* notice to him—say two bonds of 738 pounds 2 shillings and 6 pence each, payable in 1819 and 1820; and it was stated in court during the argument, that *Witmer* attended in court at this and the last trial with the money in silver.

The plaintiff gave also in evidence the record of two suits, No. 15 and 16, of November term 1818, by the administrators of *Carper* against *Adam Hawk,* and judgments thereon; and also gave in evidence certain judgments against *Adam Hawk,* to which they contended the bond of indemnity applied; and offered and tendered to defendant an assignment of the rights of the plaintiff against the fund fixed by the sale in the orphan's court, dated 7th of August 1829.

The defendant gave in evidence the record of two suits, No. 23 and 24, of November 1821, discontinued. These, I understand, were a *scire facias,* and an ejectment by the present plaintiff against *Witmer.*

Many points were, according to our custom, submitted to the court; but in the argument here, the counsel said they would rely on the bills of exception to testimony and the eleventh point.

The eleventh point was, " that from the evidence given at the trial, and from the tender now made by *Robert Geddis* and *Samuel Carper,* of the assignment, by their deed, of all their right and their remedies to the administrators of *Michael Hawk,* to substitute him in their place, and clothe him with all their securities relating to the real fund, and from their offer to file this deed of assignment under the direction of the court of record in this cause, upon their obtaining a verdict, either conditional or absolute : from all this evidence, and from this tender, the plaintiffs are entitled to an absolute verdict."

This was answered by the court, by saying, that from all the

evidence stated in the point, together with the tender of the deed of assignment, the plaintiffs were not entitled to an absolute verdict, if the jury should be of opinion that *Michael Hawk* was only a surety in the bond.

This brings the cause to the third error assigned, viz. that in the trial of this cause in the court below, the equity and the law of the land have been manifestly departed from in the charge of the court and verdict of the jury, and in the opinion of the court in refusing to exercise their peculiar and exclusive power to vindicate and preserve the law of the land from invasion and violation by a jury.

It may be admitted, that both at law and in equity the situation of sureties is materially different from what it was less than a century ago. At law, all who signed the bond or writing were considered equally principals, and no averment that one was surety was admitted. I do not know that at present any judge or lawyer would say, it may not be proved that one of the obligors was a surety; and that certain acts of the obligee will discharge a surety, which would not discharge a principal. *Theobald on Principal and Surety* 117— 130; 17 *Johns. Rep.* 391.

Even in chancery, I think Lord *Hardwicke* refused to interfere for a surety in a manner which is now so much the course of that court that no man would question it. Certain acts of the obligee seem to be admitted everywhere as amounting to a discharge of a bail warranty; but what will amount to such act is not exactly agreed upon in all courts.

The following may perhaps safely be stated as a part of the cases in which a surety is discharged by the act of the creditor.

Where the principal is discharged either totally or on paying a part, the surety is discharged; and in equity, an agreement to discharge the principal, and an assignment by the principal in pursuance of such agreement, discharges the surety, though no release of the principal be actually executed. *Theobald on Principal and Surety* 114, 115, 116.

Where the parties (that is, creditor and principal) make any new agreement inconsistent with the terms of the original one; or if they agree to make any alteration, either in the terms of the original agreement or in the mode of performing them, without the consent of the surety; the surety is discharged (*Theobald* 119 to 122): and the court are not to inquire minutely what injury the surety sustained, it is enough that he might have been prejudiced; and they are not to inquire what injury he did or will sustain. *Theobald* 123 to 131.

Where the creditor, without the consent of the surety, agrees to give time to the principal, the surety is discharged. *Theobald* 127, 180 to 182. It is not, however, the law, that the bare negative act of refraining from suit; but some agreement of the creditor which ties his hands and prevents him for a time from suing; which discharges the surety. *Theobald* 136; *Cope* v. *Smith*, 8 *Serg. & Rawle* 112.

[Geddis v. Hawk.]

Where the creditor parts with securities, or any fund which he would be entitled to apply in discharge of the debt, the surety is exonerated, at least to the extent of such securities; because securities which the creditor is entitled to apply in discharge of his debt, he is bound either so to apply, or to hold them as a trustee, ready to be applied should the surety desire it. *Theobald* 143; 8 *Serg. & Rawle* 452 to 458. And this continues if there be two judgments against principal and surety. 8 *Serg. & Rawle* 458; *Union Bank* v. *George*, 5 *Peters* 99. And this principle is put in stronger and more appropriate terms by the chief justice in 13 *Serg. & Rawle* 159. *Where the creditor has the means of satisfaction, either actually or potentially* in his hands, and does not choose to retain it, the surety is discharged.

On this same principle, this court, in *Commissioners of Berks* v. *Ross*, 3 *Binn.* 520, decided, that the agreement to permit a principal debtor who had been arrested, to enter common bail, in consequence of which he left the state, discharged the sureties.

The same principle goes to discharge a surety, where certain things are by the agreement stipulated to be done, which would benefit the security or lessen his risk, and the creditor neglects to have these things done. *Theobald* 146, 147. Much more will it apply where the creditor actually gives up what existed at the time of the engagement of the surety.

When a surety cannot, in a direct manner, or in his own person, obtain the benefit of securities or funds which are by the agreement set apart for the creditor, equity will restrain the creditor from proceeding against the surety until he has resorted to these funds. *Theobald* 256; *Hayes* v. *Ward*, 4 *Johns. Cha. Rep.* 123.

I could cite, without much trouble, many other authorities, but they will be found in the books and cases referred to, and some others I shall mention. The modern doctrine, and that of common justice and common sense, is, that there is an understanding in all cases, that the creditor ought to look to the principal, and not unnecessarily to the surety : that he is at least bound not, in any the slightest degree, by any act of his, to lessen the security of, or otherwise do injury to a surety.

Courts of equity, says Judge *Spencer*, 17 *Johns. Rep.* 392, 394, when they interpose to compel, at the instance of a surety, a creditor to sue the principal, undoubtedly proceed on the sound and just principle, that it is the duty of the creditor to obtain payment of the principal debtor, and not of the man who is a mere surety. In every such case, a court of equity proceeds on the pre-existing equitable obligation, binding on the conscience of the creditor, to exert himself to obtain payment from the real debtor, who ought to be coerced to pay it. And again he says, where is the man who will boldly avow the unjust and immoral principle; that, after his debt has become due, and he has been solicited by the surety to proceed and collect it, he will abstain from suing, with a view of favouring

[Geddis v. Hawk.]

the principal and throwing the loss on an innocent man, who from motives of friendship or humanity became a surety. *Theobald's* treatise is replete with the same doctrine. The supreme court of the United States say, in *Bank* v. *Gracy*, 5 *Peters* 114, there is a moral obligation resting on the bank to do the very thing their attorney stipulated to do, i. e. to issue execution against the principal. Every consideration of justice and equity, in a moral, though not in a legal point of view, called on them to use due diligence to obtain satisfaction of the debt from the principal, before recourse was had to the surety.

Let us now compare some of these principles, and apply them to the facts of this case. It must be observed, that no one part of the proceedings in the orphan's court to procure the sale, nor the order or decree of the court, say one word about the time when a deed was to be made by the administrators. The act of assembly of 2d April 1804, sect. 11, directs that "the court shall confirm the sale and decree the estate in the premises so sold, to be *transferred* and vested in such purchaser, as fully as the intestate held the same at his decease, *subject and liable to the payment of the purchase money*, according to the terms prescribed by the court in the order of sale." The bonds were given on the 1st of April 1810. The first deed drawn by *Hollingsworth*, and which was defective, and seems to be admitted to have been inoperative as a deed, was not made till the 6th of April 1811. The three first payments seem to have been made; but those due the 1st of April 1814 and 1815, were unpaid. Two years after the last was due, *Adam Hawk* agreed to sell to *Witmer*, and calls on the administrators for another deed. They were under no obligation to make him a deed until the money was paid; had entered into no contract binding themselves to make him one. The money had been due two or three years, and ought to have been collected and paid to the heirs of *Carper*. *Michael Hawk*, the surety, had been dead two years, and his executors had given the notice prescribed by law, to them if they claimed, and to all claimants against his estate, to produce their demands. In the face of all this they make a deed and give a receipt, *that on that day and before they had received the whole purchase money*, &c. The purchaser could not have supported a suit at law for not making the deed until he paid or tendered the purchase money. No case has been cited to show that a chancellor would have decreed a deed, and no *dictum* referred to; no principle stated on which it can be predicated that he would have so decreed. The making the deed, whether we refer to the first in 1811, or to the second in 1817, was, as much as in them lay, giving up the power they had to compel the payment of the purchase money. The title was in them; the power to compel the payment out of the 8000 dollars paid in hand by *Witmer* was in them; and they carelessly, or wantonly, or wickedly refused to exercise it; and it seems to me to fall within the spirit of many of the authorities cited, and within the very words of the present chief justice in *Lightenthaler* v. *Thomp-*

[Geddis v. Hawk.]

*son*, 13 *Serg. & Rawle* 159; *where the creditor has either actually or potentially the means of satisfaction in his hands and does not retain it, the surety is discharged.* One word would have produced the money. I do not say the land does not continue liable for this money in the hands of *Witmer*. It is not necessary to decide on that point; to a certain extent it is liable. The record is not full in that part which relates to *Witmer;* it states that he has retained 4000 dollars, but it was stated by the counsel on both sides, I think, in addition, that *Witmer*, at every trial of this cause,.had attended in court with his money in silver. If this, or part of it is so, there may be a question whether interest can be recovered from *Witmer*. And if he has been ready to pay his money from 1822, and brought it into court, (though that, except in one point of view, may be immaterial in this cause), it may be found impossible to recover interest from him. And who is to lose that interest, the defendants or the plaintiffs? The plaintiffs have varied the situation of the parties, and by so doing have discharged the defendant; and we are not to enter into disquisitions as to how far that alteration will affect them.

In one point of view this case presents a novelty. By the order of the court, and the terms of the act of assembly, which forms the contract, the land was, and perhaps is, bound to pay this money. The owner of the land is notified of this by the plaintiffs, and told he will be held liable, and forbidden to pay any more to *Adam Hawk*. He retains his money for the plaintiffs; he keeps it ready; but *Adam Hawk*, or those to whom *Adam Hawk* had assigned *Witmer's* bond, forbid him to pay to plaintiffs: and perhaps he is right in not paying till a judgment against him in favour of plaintiffs. The plaintiffs say and insist, that *Witmer* is liable, and that the defendants can, after paying, recover from him. Yet the plaintiffs, who insist he is liable, have twice sued him, and twice discontinued their suits; once after the opinion of this court on facts not so full for the defendants as appeared at this trial. Did the plaintiffs feel it their duty, in order to reach a surety, to discontinue twice against the principal? or did they feel it their duty to obtain from this court a reversal of its former decision, lest they should be guilty of the sin of collecting money from the real debtor and proper fund? or is there some wilful or some fraudulent design to oppress the defendants, and favour *Witmer* or those who hold *Witmer's* bond? In *Cope* v. *Smith*, 8 *Serg. & Rawle* 118, Chief Justice *Tilghman* intimates that there may be cases of such collusion by a creditor as would discharge a surety. And if a jury would find that some such collusion existed in this case, it could not be said they found without evidence.

The counsel for plaintiffs, in concluding, told us, if plaintiffs were sent to *Peter Witmer*, they would be delayed and perhaps defeated; but that the defendants could recover from him at once. I cannot understand this, or if I do understand it, it must mean that the plaintiffs will lose the interest in a suit against *Witmer*, or that *Witmer*

2 N

[Geddis v. Hawk.]

can prove something against the plaintiffs more than we know: perhaps I don't understand it at all.

It is now twenty-two years since the sale.  Will the lien for the purchase money continue for ever?  There was no offer to bring suit, or to permit the defendants to bring suit, until during this trial. If the conduct of the plaintiffs in varying the situation of the parties, in giving up the power of compelling payment by returning the deed, of releasing the lien as far as in their power, of refusing to apply to the proper and peculiar fund, or permitting the defendants to resort to it, do not estop the plaintiffs from an absolute verdict in this case ; it must be, as it seems to me, because the law of the whole civilized world, as administered for the last fifty years, is to be changed.

But another matter was much urged during this cause.  Not content with insisting that this court had mistaken the law, juries generally, and especially those of Lebanon county, were assailed ; and not only juries, but courts who did not control them, and keep them under proper subjection as to their power over facts.   On this subject I have heard much, and had, as lawyer and judge, nearly forty years experience.   Of perverseness and prejudice in successive juries in finding against the right and law of the case, I have heard much, but I know nothing.   I have seen verdicts set aside, and rightly, and where there is no dispute as to facts, and the jury undertake to find the law in opposition to the courts, they are always rightly set aside. But I neither know, nor ever heard of successive juries doing so in any case.   A single jury may have done so, but it is a rare occurrence ; and for once that I have known a jury undertake to decide the law in opposition to the court, I have known ten cases where the court drew different conclusions of facts from the jury, and in at least nine out of ten of such cases the jury were right and the court wrong.   A court which undertakes to control a jury as to the credibility of witnesses, or as to the facts or inferences from the testimony in a cause, is as much out of its duty as a jury who undertake to overrule the court as to matters of law.

I do not know what is meant by the phrase, that in our equitable jurisdiction the jury find the facts and then the court decide the law ; I know the constant and necessary practice, but those who use the same phrase, seem to mean something different ; they say they mean something different.   If it be meant that the jury must go out and find the facts, and come in and state them to the court, who are then to decide the cause ; it means what is impracticable and absurd. Under our present practice, that the court states the law and the jury retire and find their verdict, whether in legal or equitable contests, I believe justice is as well administered in this state as in any part of the world.   Some more equitable authority ought to be given in a few cases; but of all the modes which have been proposed of improving our judiciary system, any one which restrains the weight and power of juries, as I have seen it exercised, would be the last in which I would concur.

[Geddis v. Hawk.]

Our usage and law is, that a party may give in evidence the facts on which he relies as an equitable defence : these facts may be the testimony of persons who saw and heard the whole of the transactions, or of the agreement of the parties in writing, or it may be of facts and circumstances, admissions, &c., from which a jury infer that certain facts took place or agreements were made ; in other words, it may consist of direct or circumstantial testimony. I do not understand, perhaps, what is meant by a case calling for strict proof. If it means that circumstantial proof from which a jury can and do infer a fact, is not equal to positive proof of that fact, I deny it to be law. There is no possible case in civil or criminal law in which any fact may not be made out by circumstantial as well as direct proof ; except, perhaps, where a positive legislative enactment requires a specific kind of evidence ; and the power of the jury is peculiarly their own in determining on evidence, all or a part of which is circumstantial. These observations may not appear pertinent to the record in this case, but were required by the course of argument in the case.

I am, then, of opinion, that the whole of the evidence was rightly admitted. That unless the facts on which an equitable defence is founded go to a jury, our equitable jurisdiction is, to all useful purposes, at an end. That it may be possible for a court in some cases to say *a priori,* Your proof, if given, will not amount to a defence : yet there are few such cases come into court, and this is not one of them. No counsel can state precisely what a dozen witnesses will state ; no court has the right to judge of the credit of each of those witnesses, or to select what it will believe and what it will reject. The jury is an essential part of our judiciary—no court will long continue to assume the functions of a jury, and none ought to be permitted to do so.

I am further of opinion, that if the jury found the facts in a certain way, there was a valid defence in law and equity, and the judgment ought to be affirmed.

Judgment reversed, and a *venire de novo* awarded.