9 W    363
33 SC ¹277

# Mehaffy *against* Dobbs.

A proceeding in partition in the orphans' court under the intestate laws, by which real estate is confirmed to one of the heirs at a valuation, is not conclusive of a question of title to the land confirmed to the heir, as between him and another heir, who claimed adversely and disavowed the proceedings.

As between tenants in common, a legal presumption of ouster arises in favour of one who has been in the peaceable and exclusive perception of the profits of the land for more than twenty-one years.

Recitals of fact in a conveyance are not to be taken as a conclusive assertion by the grantor; on the contrary, being generally the work of a scrivener, they are entitled to but little respect by a jury.

ERROR to the common pleas of *Cumberland* county.

This was a *scire facias* upon a recognizance in the orphans' court, by John Dobbs and Andrew Dobbs, executors of Thomas Dobbs, who survived his wife Janet Dobbs, against Moses Eby, surviving cocognizor with Margaret Mehaffy and David Eby, with notice to James Mehaffy, Thomas Mehaffy, and Martha Mehaffy, brought to April term 1837.—Pleas payment with leave, &c., and the terre tenants pleaded that they hold no land bound by the lien of the recognizance.

Plaintiffs gave evidence as follows:

December 12, 1815. Petition of Margaret Mehaffy, daughter of Thomas Mehaffy, deceased, for partition and valuation of 225 acres of land. The petition recites that there were seven children, of whom Janet Dobbs was one.

May 14, 1816. Writ of partition.

September 16, 1816. Inquisition quashed and *alias* awarded.

December 10, 1816. Inquisition returned and confirmed; divided the land into two tracts; and rule upon the heirs to appear and accept or refuse, &c.

February 18, 1818. John Mehaffy, the only son, came into court and refused to take, and the others all refused but Margaret Mehaffy, who elected to take part No. 2, containing 104 acres 132 perches, and the same was awarded to her; whereupon she entered, *inter alia*, into the recognizance upon which this suit is brought, conditioned to pay Thomas Dobbs and Janet his wife 707 dollars 36 cents on the 12th of February 1819, with interest from the 12th of August 1818—upon which evidence being given the plaintiff closed.

Whereupon the defendants, to maintain the issue on their part, read the deposition of Captain Samuel White, who being duly sworn, doth depose and say: My father's property adjoined the land where Andrew Mehaffy lived. I was born on the land adjoining. I can remember as far back as 1795, and before that, when I was ploughing in the fields of my father adjoining. John Mehaffy from my earliest recollection, lived on the land adjoining Gilson Craighead, and occupied it, lived on it and farmed it as his own. I remember also that he made a contract with John M'Culloch to clear a part of it, and M'Culloch was to have either two or three crops for the clearing of the land. After he had cleared and raised one crop, then he got my brother to farm it one year on the shares; and that year I helped to plough the land for my brother. I remember of John Mehaffy's living in the new house on the land; Andrew Mehaffy lived on the other part of the land. I know the line between them, and each farmed and occupied his own part as far back as I can remember. At first, when I remember the land as far back as 1795, there was a part of the division between them which was a road, and John farmed up the road on one side and Andrew on the other side. I never knew or heard of any dispute between John Mehaffy and his brother Andrew Mehaffy about their respective rights; as things appeared each had his own, and farmed his own. Several years after, M'Culloch cleared land for John. I remember that John's sons then began to grow up stout boys, and they and their father cleared some more land on their part. I never heard of any dispute about their lands between them, until some time after Andrew Mehaffy's death, some years, perhaps; I cannot remember. I know the land that James Mehaffy and Thomas Mehaffy, the sons of John, now live on, and it is the same land their father John Mehaffy lived and died on. I remember that two of the girls, whose names I think were Margaret and Martha, lived with Andrew from the earliest time that I can recollect, on Andrew's land adjoining John's. I never heard of John farming any part of Andrew's land, or Andrew to farm any part of John's land, each farmed his own, and got the whole proceeds of his own.

John Dobbs and Andrew Dobbs, executors of Thomas Dobbs, deceased, appeared, and cross-examined the witness; who answer-

ed. I remember old Thomas Mehaffy, the father of Andrew and John; I saw him at my father's house: I never knew that at the time that Thomas Mehaffy was alive, he claimed the whole of the land. I was too young to know it if he claimed it. I never knew of any legal transfer of the land or any writings between Thomas Mehaffy and his two sons Andrew and John.

Robert Moore, sworn.—I can remember John Mehaffy from 1790. He lived on the old place; was then unmarried. I have seen old Thomas Mehaffy once or twice, and he was alive at that time. John Mehaffy was married in 1791. Sometime after he was married he lived with the old people. I made John's wedding coat. I know where defendants James and Thomas Mehaffy live now; it is on the same place their father lived: he commenced building a house, I heard, in 1794 or 1795. I can remember John's living in that house, on the land in controversy; think John died there; never knew him to live any where else; John lived up the creek. Andrew continued to live in the old place; his sisters lived with him, and a daughter of Mr Allison, who (Allison) married a daughter of Mehaffy's. I knew John Mehaffy worked the upper part of the place himself; never knew Andrew or any body else but John to farm the upper part. James and Thomas the present defendants, now live on the same land. John their father is dead. There is a house and barn, and tenant put on the place since John went there; the barn at James' is a middling good one.

Cross-examined.—Old Thomas died on the old place, in the old house.

George Ege, sworn.—I recollect this land now in dispute, as early as I can recollect any thing; can remember the house John Mehaffy lived and died in, prior to 1794; John Mehaffy lived in it then; never knew him to live any where else; I know it was prior to 1794, because at that time I commenced going to college. In passing back and forward along the road, I always saw John Mehaffy and his sons after him, farming the place. Considerable land cleared since I first remember it, and fenced; there was some stabling there from my earliest recollections; additions have been built since, and perhaps the whole barn there now, has been built since John Mehaffy went there. Never knew any body to do any act of ownership on the upper part of the place but John Mehaffy and his family. John died on the place, and his sons reside in that house; there has been a house built some years back, near Craighead's mill, said to be on the same tract.

Jacob Shoff, sworn.—I know this land in dispute; I can remember it thirty-seven or thirty-eight years. In 1800 I lived at the forge; in the year 1802 was well acquainted with John Mehaffy. Forty years last October since I came to that neighbourhood to live. When I first knew this property John Mehaffy lived on it; Andrew lived at the lower place; John farmed his own land himself, claimed it as his own for all I ever heard; never knew a

dispute about it during Andrew's life time. Andrew died in 1811; John Mehaffy died in 1832 or 1833; Thomas Mehaffy died in 1792 or 1793.

Jacob Richwine, sworn.—Remember this land for forty-four years: John Mehaffy lived on the upper and Andrew the lower all the time I was neighbour. Can not tell who farmed upper tract, but I saw John ploughing; not a great deal cleared when I first saw it; cleared just about the house down to old place; suppose about ten acres cleared there, as near as I can remember; good deal cleared now; no barn on it when I first knew it; no tenant house as I know of.

The 10th of June 1762, warrant to Thomas Mehaffy upon which he paid 12 dollars and 80 cents.

The defendants then gave in evidence the record of an ejectment as follows:

Margaret Mchaffy *v.* John Mehaffy and Thomas Mehaffy. No. 23, August Term, 1818. In the common pleas of Cumberland county. Summons in ejectment, for the tract of land taken by Margaret Mehaffy at the appraisement; 1st of May 1818, referred to arbitrators; 20th of June 1818, report of the arbitrators filed, "No cause of action;" 6th of July 1818, plaintiff appeals; 31st of July 1822, jury empannelled; 3d of August 1822, jury discharged by the court.

Then the plaintiff called Richard Craighead, who said:—I recollect from 1777. I know this land from that early date. Thomas Mehaffy lived on this land; he had as good a log house as was in that county at that time. His stock had been divided off; before he died had good stock, while all lived together. The house in which John lived was put up before he was married, while all lived together; can not tell whether it was finished before he moved into it'; the old man was frail for some years before he died. Andrew was oldest son, but two sons, Andrew and John. Old Mr Mehaffy had no other lands but those. Three daughters married, one to Dobbs, one to Love, and one to Allison; there is a daughter of Allison's lives on the place, lived there before her grandfather's death; Andrew farmed lower end, and John farmed upper end: would rent for 150 dollars; the lane would throw both houses on upper end, where road went; do not know whether there was a division line or not; do not know whether they worked to the road or not, or whether there was a line or not. The road I speak of was stopped up sometime after John went to live in his new house.

Cross-examined.—John continued to live in same house till his death; the upper part John farmed exclusively himself; never knew any body to farm any part after John moved there; never knew him to pay rent, or give share for occupying it; John built a tolerable log barn and tenant house; cleared a good deal of land; not a great deal cleared on upper end when John went there: thirty or forty acres cleared at the time John went there to live; that much

above old house on end John took; fifteen or twenty acres about the house, and field up in the woods: I bought timber from both Andrew and John; cut in the same place; paid them both for it, this was in 1812 or 1813.　Thomas Craighead bought all his timber for his barn from the two men; this was since Thomas Mehaffy's death, in 1813 or 1814.

Application of John Mehaffy, for 200 acres of land, in South Middleton; improved in 1792.

March 1819. Deposition of John Mehaffy read: warrant to John Mehaffy, for 200 acres of land, adjoining lands of Gilson Craighead, P. Lobach, David Eby, Henry Eby, on Yellow Breeches creek, situated in South Middleton township: interest from 1st of March 1755, dated, the 12th of March 1816, not marked executed: survey on Thomas Mehaffy's warrant, executed by P. Davidson, deputy surveyor; made on the 17th of April 1835, in pursuance of a warrant to Thomas Mehaffy, dated the 10th day of June 1762; first survey 197 acres; second survey 185 acres 97 perches.

Receipt for payment of purchase-money by Thomas Mehaffy, carried to credit of John Mehaffy, when patent was procured; balance of patenting money 217 dollars; paid by John Mehaffy and his sons.

Patent to James and Thomas Mehaffy, 185 acres 97 perches, and allowance; surveyed in pursuance of a warrant to Thomas Mehaffy, dated the 10th of June 1762, whose right, patentees have, &c.

Patent dated the 28th of June 1836.

Deed from Andrew Mehaffy, John Mehaffy, Margaret Mehaffy, and Martha Marshall to David Eby, dated the 1st of July 1807.

This deed was for a small part of the whole tract, but not any part in possession of the terre-tenants, and contained a recital that it was part of the land of which Thomas Mehaffy died seized. And the object of the evidence was to show an acknowledgment by John Mehaffy, that his father had died seized of the whole of the land, including that in dispute.

William Line, sworn.—In 1814 I was deputy surveyor of the county; was doing business in South mountain; Love's eldest son mentioned to me that the Mehaffys held a tract of land for which they had no warrant; John Mehaffy asked me and the others about, how they had better have that matter fixed.　I told them they had better get a warrant; and having understood that they held it in common; heard it repeatedly from the parties, John and others; I told them they had better take out a warrant in trust for the use of the heirs, and I advised them to have it surveyed immediately. The next day or day after, I did make a survey of the whole tract; and my recollection now is, that there was an application in trust for the use of all the heirs: when I went to Harrisburg, I found this warrant of 1762 to Thomas Mehaffy; in the year 1807, I undertook to build an addition to Eby's house; he bought the timber from Andrew Mehaffy; the lower part of the tract Eby, Mehaffy,

and myself, went out.   Andrew Mehaffy pointed out the line be-
tween him and his brother John, which each claimed up to; I went
on and cut and hewed the timber; John came out to see whether
I was transgressing; both pointed out the lines through the fields;
space left up to the line not farmed by either party; this was the
same year Eby purchased; and said Mehaffy wanted to sell more;
Andrew frequently spoke to me about this, and wanted me to buy.
John also spoke to me; I told them I did not think the title was
good: I understood from them both that they held the land in com-
mon, and the heirs would convey as they conveyed to Eby; that
there was land enough left for the other heirs, in the same tract;
they spoke of the whole tract as I understood them; I understood
from them the whole tract was common land; the lines in the field
was on one side called Andrew's tract, and the other John's tract;
did not learn object of line; each man observed his side of line in
selling timber; John frequently farmed land on Andrew's side; put
in fields for him; I have heard John speak of a will, making a
division of the land as well as the other members of the family.

Cross-examined.—Heard them frequently speak of a will; do not
recollect ever hearing John claim this land as his own, till execu-
tion of partition distinctly; John was an exceedingly easy man;
never knew of John paying any rent; he did not raise a great deal
till his sons grew up; they seemed to live well enough; their lands
were exhausted; when his sons grew up they cleared land; John
was an easy, inoffensive man; John opposed the holding of the
inquisition and claimed the land as his own.

Plaintiff.—In 1814 there was no separate claim set up by John
and Andrew, when the application was made; John was an igno-
rant man; I have every reason to believe they placed implicit con-
fidence in what I advised.

Rebutting evidence by defendants.   Testimony of I. B. Parker,
read:

It is admitted, that Isaac B. Parker, Esq., has sworn that upon
the proceedings upon the writ of partition and valuation of the real
estate of Thomas Mehaffy, deceased, John Mehaffy, the father of
the present James and Thomas Mehaffy, appeared in court when-
ever notice was served upon him, and denied that Thomas Mehaffy
at the time of his decease, had any title to the land mentioned in
the said proceedings, and that when called upon on the return of
the rule upon the heirs to accept or refuse to accept the land at the
valuation, he appeared in court and said, that he would not accept
the same, but that the land was his own and he would hold it.

James M'Clune, sworn.—These defendants have the whole land
except about 2½ or 3 acres, a patch embracing the old house and
orchard; they are now in the occupancy and enjoyment of the
whole tract; took it by force within eleven years back.

Sarah Allison sworn.—Lived in same house with uncle Andrew
and two aunts when Thomas Mehaffy died.   I was born in the

[Mehaffy y. Dobbs.]

house on that part which John claimed; house not standing. Grandfather lived in the old house on the farm till he died; I have lived there ever since. According to John's conduct I could hardly tell whether he claimed separate right or not; sometimes they were peaceable and sometimes at variance, but it never extended further than words. After the death of my grandfather every one worked as they could, and took the product themselves. I knew of no particular division; they worked as suited themselves.

Cross-examined.—John moved to upper end of place directly after he was married. I was born in 1781, ten or eleven years old when John was married. Andrew died in 1811. Andrew farmed fields that they now claim on that side of the place; I knew Andrew to farm land upon that side; he did farm there after 1794 or 1795; he fetched the grain home to his own barn; each one took what they raised; nothing but repairs of stabling, &c., done on Andrew's part. Margaret Mehaffy is about twelve years dead; she lived and died in the same house I live in on the lower part of the land. John nor his sons never paid the other heirs any thing that I know of. No letters of administration ever issued on the estate of old Thomas Mehaffy.

Sarah Allison, again.—John never claimed the land that I heard till after uncle Andrew's death; I lived on the land all the time; he died before the inquisition. I said I did not know from his conduct whether he claimed it or not, because he was sometimes peaceable and sometimes not, about the parts of fields and timber. They have now got the whole tract but the lot I live on.

Defendants' testimony:

Assessment book for 1820, 1821, 1822, South Middleton township—John Mehaffy 100 acres land, valuation 2600 dollars. Mary Mehaffy 100 acres land, valuation 2600 dollars.

Assessment book for 1826, 1827, 1828, John Mehaffy 100 acres land, valuation 2000 dollars. Mary Mehaffy 90 acres land, valuation 1800 dollars.

Assessment book for 1817, 1818, 1819, John Mehaffy 100 acres land, valuation 1000 dollars. Margaret Mehaffy 100 acres land, valuation 1000 dollars.

Assessment book for year 1808, Andrew Mehaffy 141 acres. John Mehaffy 141 acres.

Year 1802, Margaret Mehaffy 190 acres. Andrew Mehaffy 125 acres.

Year 1805, John Mehaffy 125 acres. Andrew Mehaffy 125 acres.

Defendants close.

Plaintiffs again:

Sarah Allison, again.—Andrew claimed the land as an heir in common with the others; never claimed it as his own.

Plaintiffs' points:

1. The recognizance in this case is in the nature of a judgment; the consideration cannot be inquired into upon this writ of *scire*

*facias*. The orphans' court had jurisdiction, and its decree cannot be questioned in this collateral way.

2. Only the "right and title" of Thomas Mehaffy, deceased, import to have been vestsd in Margaret Mehaffy by the decree of the court. The want of title in him, cannot, therefore, constitute any defence to this *scire facias*.

3. This *scire facias* is based upon a debt of record; that record imports verity, and its validity cannot, in this suit, be questioned. If there be any remedy in such cases, it is by obtaining the record to be amended on a bill of review.

4. The taking of the land by Margaret Mehaffy at a valuation, is equivalent to a purchase under sale by administrators under a decree of the orphans' court. It is virtually a judicial sale, and no defence can be made to the payment of the price of the land on the ground of defect of title in the deceased;—*caveat emptor* applies.¹

5. The deed and the recitals in the deed, from John Mehaffy, and the other heirs of Thomas Mehaffy, in 1807, to David Eby, are evidence that the parties at that time considered the title to the whole tract to be in the heirs of Thomas Mehaffy, not in his son John.

6. If the warrant of 1762 is descriptive of the land, that coupled with the residence proved, vested a title to the land in old Thomas Mehaffy, which, upon his death, would descend to his heirs under the intestate laws, and would give jurisdiction to the orphans' court to award a writ of partition or valuation, and to vest the title in any one taking the land at the appraisement.

7. That the warrant to John Mehaffy, Jun., in 1816, and the subsequent survey and patent in 1836, would not defeat or affect the original title.

8. That John Mehaffy, Jun., in his lifetime, was tenant in common with his other brother and sisters, unless a legal transfer of the title was made to him by his father in his lifetime, and his possession is not to be presumed to have been adverse to his co-heirs, and the lapse of time, under such circumstances, would not vest in him a right, in exclusion of his brother and sisters.

9. The application and oath of John Mehaffy, for, and taking out the second warrant after his father's death, was fraudulent, and vested no title in him or his heirs, and if not void absolutely, he (John) held it in trust for the heirs and representatives of Thomas Mehaffy his brother.

10. The ejectment brought by Margaret Mehaffy, in 1818, against John Mehaffy, Jun., and still pending, prevents the operation of the statute of limitations, from the time such ejectment was instituted, and the recital in the deed to Eby in 1807, and other proof, repel any presumption of adverse holding at that date.

11. During the pendency of her ejectment Margaret Mehaffy can disclaim any interest under the decree of the orphans' court.

Defendants' points: The court is respectfully requested to charge the jury upon the following points, and to file their charge of record:

[Mehaffy v. Dobbs.]

1. That the title to the tract of land containing 104 acres and 132 perches, as designated in the record of the proceedings in partition and marked No. 2, and taken at the appraisement by Margaret Mehaffy is the only land the title to which is in controversy in this suit.

2. If the jury believe that Thomas Mehaffy took out a warrant for the tract of land in 1762, of which the land in controversy is a part, and never had that warrant executed by a survey, and that the said Thomas Mehaffy relinquished the land in controversy to his son John Mehaffy as early as 1792, 1793, or 1794, and the said John Mehaffy took possession of the same in the lifetime of his father, and that it was separated from the land retained by his father by a known and consentable line between them, and that the son John Mehaffy resided upon and improved the land thus relinquished by the father from that period until the present time, it would operate as an abandonment by the father of the land thus relinquished in favour of his son, and the said John Mehaffy might have taken out a warrant for the land, and perfected the title in his own name, if he had chosen to take that course.

3. If the jury believe that John Mehaffy went into possession of the land now in controversy in the lifetime of his father Thomas Mehaffy, as his own, and used it, and farmed it, and occupied it as his own, and there was a known and consentable line of boundary between it and the land on which Thomas Mehaffy had lived and Andrew Mehaffy and his sisters after their father's death, and so continued from that time until the present day, that the statute of limitation is a bar to the plaintiff's recovery against the terre tenants, James and Thomas Mehaffy, in this suit.

4. If the jury believe that Thomas Mehaffy, the father, put his son John Mehaffy into possession of the land now the subject of controversy, at the time of his marriage, to live on and improve the same as his own, and designated the boundaries of the same which were known to him and his other children after his death; and that the said John Mehaffy, during his father's lifetime and after his death, expended his money and his labour in the erection of buildings and clearing land and improving it, thereby greatly enhancing the value of the same, then the possession of the present terre tenants, children of the said John Mehaffy, cannot now be disturbed by reason of any claim founded upon the original title of Thomas Mehaffy.

5. If the jury believe that Margaret Mehaffy derived no title to the land in dispute by reason of the proceedings in partition as given in evidence, then the plaintiffs are not entitled to recover in this suit either from the surety, Moses Eby, or from the terre tenants, James and Thomas Mehaffy.

Charge of the court to the jury:

" The suit you are about to decide by your verdict, arises upon a recognizance taken in the orphans' court of this county, in favour

of Thomas Dobbs and Janet his wife, in right of his wife, who was a daughter of old Thomas Mehaffy, deceased, to secure her interest of the money in the part No. 2, of his real estate, accepted at the appraisement and valuation of the inquest by Margaret Mehaffy her sister, against Moses Eby, who is her surviving cocognizor in the recognizance; with notice to James Mehaffy, Thomas Mehaffy and Martha Mehaffy, children of John Mehaffy, deceased, who are said to be in possession of the same property bound by this recognizance. To bring the facts more particularly to your view and refresh your recollections; it may not be amiss to recapitulate the testimony.

"On the 12th of December 1815, Margaret Mehaffy, who also entered into this recognizance, presented her petition to the orphans' court of this county, for a writ of partition and valuation of the real estate of her father, Thomas Mehaffy, deceased, on which petition the court, after certain intermediate proceedings previously detailed to you, on the 16th of September 1816, awarded an inquest, which was returned by the jury and sheriff, dividing the property as set forth, and fixing the valuation upon it as stated, which was confirmed by the court on the 10th of December 1816; and rule upon the heirs, granted to accept, &c.; a pluries rule, to same effect, 11th of December 1817; returned 18th of February 1818; and all the parties refusing to take, &c. Margaret Mehaffy took part No. 2, which was confirmed to her by the court. David Eby and Moses Eby, the defendant, approved by the court as her sureties, who with her entered into a recognizance to pay the plaintiff's testator in this suit 707 dollars 36 cents on the 12th day of February 1819, with interest from the 12th of August 1818. On this recognizance the *scire facias* you are now trying issued, and that sum with its interest the amount claimed by the plaintiffs in this suit. It is resisted by Moses Eby, the defendant, and also by the Mehaffys, who are alleged to be in possession of land bound by the lien of it, and out of which the money may be made, if you find against them on their issues. Eby, the defendant, denies his liability to pay, because the land taken by Margaret Mehaffy, as he says, was not part of the estate of Thomas Mehaffy, deceased, and consequently no consideration given for the recognizance entered into; and the terre tenants resist the payment, because the land, as they say, belonged to their father, and not to their grandfather; and that the land in dispute at the time of partition, was their father's separate estate, and not a portion of the estate of Thomas Mehaffy, their grandfather.

"Now we say, as matter of law, that if the tract of land, No. 2, in the inquest was the estate of John Mehaffy, the father of the terre tenants, and not the estate of Thomas Mehaffy, and formed no part of his estate, a recovery could not be had against the defendant in this suit; and a proper disposition of this important inquiry by you as matter of fact, would in my opinion have disposed of the case.

[Mehaffy v. Dobbs.]

But the counsel upon each side have furnished us with a list of points numbering twelve upon one side and five upon the other, which we will endeavor to answer according to our best judgment, formed by a hurried investigation during the trial of this cause.

Plaintiffs' 1st, 2d, 3d and 4th points read and answered in the negative.

The 5th point is crossed out and withdrawn.

The 6th point read. Answer:—" The deed and recitals are evidence, but the extent to which they are evidence in proving the facts indicated by this point is for your determination, not ours.

The 7th point read. Answer:—" This is true unless you find Thomas Mehaffy had parted with his right as indicated by the defendant's points which I will presently read.

The 8th point read. Answer:—" The facts above stated in this point would not defeat or affect the original title.

The 9th, 11th and 12th points read.—And answered in the affirmative.

The 10th point read. Answer:—" Under all the circumstances of this case we cannot answer this point in the affirmative.

Defendant's points read. " The 1st, 2d, 4th, and 5th, answered in the affirmative:—If you find the facts as there stated; but whether the facts recited in those points are in accordance with the facts of the cause will be an important inquiry in your investigations. You must recur to the testimony for the purpose of discovering if possible a relinquishment as indicated by the 2d point, and an entry upon the land as stated in the 4th point. I cannot recall any part of the testimony leading to such conclusion. I cannot recollect any witness that proves John entered into possession of the tract in question as his own in the life time of his father, or that he was put into it by his father to live upon and improve it as his own. Mr White speaks of the land as far back as 1795, which was after the death of Thomas Mehaffy his father, and that then he John was living on it and farming it as his own, but no indication so far as I recollect his testimony that John claimed it as his own land in exclusion of his brothers and sisters. Andrew also farmed the other part of the place; the two brothers seemed to have had it between them in some way, but precisely how is not so easy to determine. Robert Moore speaks of his (John) being on the property from about the same time 1794 or 1795. This is also after the death of his father. Captain Ege, Jacob Shoff, and Jacob Richwine, all speak of it about the same time. I cannot recall a single adverse act in relation to the land in dispute done by John as testified to by any witness until long after. Richard Craighead knew the land since 1777; Thomas Mehaffy lived there then and died upon it in 1792 or 1793; and says that after the old man's death he bought timber from both Andrew and John, and though cut in the same place paid both them for it; he may be mistaken as to the year but can you doubt the fact as testified to by him; that he did buy timber

IX.—2 G*

[Mehaffy v. Dobbs.]

from them after the death of their father; and Judge Line swears that as late as 1814 he heard repeatedly from both the parties that they held the whole tract in common, and though they showed him the line so much talked about in 1807, they in 1814 admitted to him the whole tract of land was held in common among all the heirs. Sarah Allison, if you believe her, swears, that though she lived on the land all the time from the death of her grandfather Thomas Mehaffy, she never heard John claim this land till after the death of her uncle Andrew; and she swears positively that Andrew did farm fields on the tract in dispute after 1794 or 1795; that he brought the grain home to his own barn and that each took what they raised; now can it be, if these facts are believed, that the confidence thus induced by John's profession to hold in common with the other heirs up as late as 1814 or until the twenty-one years had elapsed can be termed by him in fraud of his professions to his own advantage as it suits him, pleading the statute as a bar to their recovery, if he did acknowledge that he held in common with the other heirs as the witness proves, the statute of limitations will now afford the defendants no protection. See 7 *Watts* 583.

Defendant's 3d point read. Answer:—"If the entry as his own mentioned in this point is designed by counsel to have been under an agreement or arrangement with his father, or as adverse to his father's right then we answer in the affirmative.

"But the application of the law stated to the facts proved in the present issues, is for you, and the correctness of the facts recited in this point is also for you. I must confess so far as I can understand them, they essentially differ from those proved. The whole facts, however are for you; we do not design taking them from you nor controlling your judgment in relation to them.

"The case as it strikes us is a plain one about which you cannot have much difficulty. Causes must be tried in court upon the law and evidence in each particular case, and not by considerations of hardship. If a party comes into court with a proper claim, sustained by competent testimony, they should not be defeated by imaginary hardships, which for my part I am at a losss to perceive in the present controversy. If the daughter of Thomas Mehaffy, deceased, was entitled to a share of her father's estate, and the terre tenants in possession of the property bound by her recognizance, is the hardship of giving it to her descendants alone to defeat her? We sincerely hope not; but trust that this case, like all others, will be disposed of by you according to law and the testimony given you in the cause. The facts are for you, the law we have stated."

Charge excepted to by defendants.

Errors assigned:

1. The court erred in answering the plaintiff's ninth point in the affirmative.

2. In answering the plaintiffs' eleventh point in the affirmative.

3. In answering the plaintiffs' twelfth point, which is unintelligible, in the affirmative.

4. In their answers to the defendant's first, second, fourth and fifth points.

5. In their answer to the defendant's third point.

6. The court perverted the truth of the case in their whole charge to the jury.

*Biddle* and *Watts*, for plaintiff in error, contended that the proceeding in the orphans' court, confirming the land to Margaret Mehaffy, was not conclusive upon John Mehaffy, and on this point cited 1 *Whart.* 7; 6 *Serg. & Rawle* 271; 4 *Bin.* 91; 6 *Bin.* 490; 3 *Penn. Rep.* 199; 2 *Watts* 202; 2 *Bac. Ab.* 367, 387; 14 *Serg. & Rawle* 181; *Act of* 1794, sect. 22; *Act of* 1804, sect. 1. On the subject of the laches of the plaintiffs, in delaying the proceeding against the sureties, cited 13 *Johns.* 174, 383; 17 *Johns.* 167. If the court charge the jury upon matters of fact, so as to mislead them from the true matters of inquiry, it is error. 8 *Watts* 304, 385; 5 *Watts* 49, 185; 6 *Watts* 469; 7 *Serg. & Rawle* 237; 11 *Serg. & Rawle* 135; 4 *Serg. & Rawle* 442, 333. In answer to the plaintiffs' ninth point, the court say that John Mehaffy was a tenant in common with his brothers and sisters, unless there was a " legal transfer of title made to him by his father:" this was error, for John may have had a good title by a parol gift by his father, followed by valuable improvements. 1 *Bin.* 378; 3 *Watts* 255. If the charge be contradictory, so as to leave the jury at a loss, it is error. 11 *Serg. & Rawle* 319. Whether possession is adverse or not is a fact for the jury. 2 *Penn. Rep.* 180; 3 *Penn. Rep.* 132. But it was the duty of the court to instruct the jury that, upon the facts of the case, they were bound to presume a legal ouster, which precluded the plaintiff's right to recover. 5 *Watts* 147; 3 *Watts* 77; 10 *Serg. & Rawle* 182. But how the ejectment brought in 1818 serves to repel the presumption of adverse holding, we cannot comprehend; and the recital in the deed of 1807 to Eby, so far from serving the same purpose, we consider the weakest kind of evidence. The twelfth point of the plaintiffs is unintelligible, and the court, therefore, erred in answering it in the affirmative.

*Reed* and *Alexander*, for defendants in error, contended that there was no evidence of the possesion of John Mehaffy in the life time of his father; after his death, his possession was that of a tenant in common with his brothers and sisters; and, in 1807, by the recitals in the deed to Eby, he made a distinct acknowledgment that they all held the land in common; and, in 1814, he made the same declaration as testified by William Line, by which he is now estopped from denying it, and from claiming an adverse possession. The instruction given in answer to the eleventh point was right, because if there be a recovery in this suit, and a sale of the land,

[Mehaffy v. Dobbs.]

the purchaser would be entitled to be substituted in that action of ejectment in the place of Margaret Mehaffy deceased.

The opinion of the court was delivered by

GIBSON, C. J.—There are two material subjects of error on which the jury were misdirected—presumption of ouster from lapse of time, and recital of seisin in the common ancestor.

Before entering into a particular examination of these, it is proper to premise that John's title, whatever it may have been, was not concluded by the decree of confirmation in the proceedings in partition. He was not a party to those proceedings, which were indeed not *inter partes* at all; and a decree *in rem,* though it concludes all the world as to matters properly determinable by it, concludes not rights determinable *inter partes;* and such was the right set up by John to hold the part of which he was possessed in severalty. It was an ordinary subject of ejectment by the other children, and the orphans' court could not take cognizance of it. It has been said that it came in question incidentally, and that jurisdiction of it was consequential and necessary. Shall not, however, the party to be affected have a trial by jury? He may have it by an issue directed to the common pleas. But why do incidentally what may be better done directly? I know not how a court can determine a matter indirectly of which it may not take cognizance immediately. The argument, however, disclaims a power in the orphans' court to take cognizance of a contest for title at all, and declares that it must be remitted to the common pleas. The very fact that it does so, shows that the orphans' court has neither incidental nor direct jurisdiction of it; and how the decree of a court can conclude a party as to a matter which it does not pretend to have tried, and which it confesses that it is incompetent to try, is what I cannot comprehend. But the party might be concluded by the verdict and judgment on the collateral issue. It is decisive against this suggestion, that jurisdiction, thus exercised, would conclude the party by one verdict and judgment in a common law matter, proper to be decided in an action of ejectment. The statutory partition is evidently adapted to, and, therefore, intended for, an intestate's several estate actually possessed by him at his death, and indisputably held in common by his children. The preliminary course of proceeding where he has held in common in his life time, was pointed out in Strohecker *v.* Feather, 3 *Penn. Rep.* 505, in which it was ruled, that the orphans' court cannot make partition .betwixt the children and their father's co-tenant, and among the children themselves. For the same reason, it is necessary, first, to settle, before the proper tribunal, a question of joint or several tenure between the children themselves, where one is made, and then to make partition in the orphans' court of the whole or a part, according to the event; and this is admitted to be the proper course where the disputant is a stranger. But it is sug-

[Mehaffy v. Dobbs.]

gested that John, who was a son of the common ancestor, cannot be viewed as such.  He might, however, make himself a stranger, as he did, by claiming adversely and disclaiming an interest as a son.  *Cum duo jura in una persona concurrunt, æquum ac si essent in diversis.*  He had no day in court by the proceeding; and, though he was ruled in, to exercise a supposed right of election, he disclaimed it.  The partition, therefore, stands clear of collision with his title.

If, then, he originally entered as a tenant in common, but held the contested part in severalty, he may have held it adversely. There was evidence that he entered as early as 1794, and occupied it in severalty as a man would occupy his own.  There was no positive evidence of ouster before 1818, when he procured a warrant for it in his own right; but might not an ouster be presumed from lapse of time?  In Fisher *v.* Prosser, *Cowp.* 218, it was presumed, betwixt tenants in common, from uninterrupted possession without counter claim for thirty-six years; but, in Frederick *v.* Gray, 10 *Serg. & Rawle* 187, the time was reduced to the naked period of the statute of limitation.  Now John began to occupy in 1794, or before it; the partition was consummated in 1818; and if he had then gained a separate title by the statute, the land sought to be charged had ceased to be a part of the intestate's estate; and, not being a part of what was decreed to the cognizor, was not bound by her recognizance.  The rule laid down in Frederick *v.* Gray is, that the statute bars the right of a co-tenant out of actual possession, where his fellow has exclusively claimed the whole for twenty-one years; but by exclusive claim is not to be understood a formal denial of the other's right; on the contrary, it was deemed sufficient that the occupant had manifested, by her acts, that she considered herself owner of the whole.  Can it be doubted that John had so considered himself?  There certainly was evidence that he had separately farmed his part according to a line of division betwixt it and the rest of the tract.  Too much stress it would, therefore, seem was laid on the want of a positive denial of the title; and, in this respect, the direction tended to mislead the jury by impressing on them a belief that it was indispensable.  The difference betwixt the English rule and ours, regards the period, not the circumstances or quality, of the enjoyment; and, though Lord Mansfield admitted, in Fisher *v.* Prosser, that refusal to pay is not enough without denial of title where profits have been demanded, yet he said that, where none had been demanded, or payment of rents has not been made, or where there has been no claim by the outstanding tenant, and no actual acknowledgment of his title, it is sufficient for a jury to presume, not indeed a forcible dispossession by the shoulders, but what is nevertheless an actual ouster.  The circumstances of the enjoyment, in our case, very much resemble those in Frederick *v.* Gray, where the heir at law, as well as the tenant herself, had considered her the owner.  There seems to have

been an entire acquiescence in John's possession by the rest of the children; and Sarah Allison testified, that "it was hard to say whether he claimed a separate right or not, that he was sometimes peaceable about parts of the fields and sometimes otherwise." That looks very much like an assertion of exclusive right. But it is decisive that, from the exception of John's possession, he took the profits without participation and without objection. Sarah indeed testified, that "Andrew farmed fields which they (John's children) *now* claim on that side of the place;" but she further said, "they have now got the whole place but the lot I live on." The question, however, regards not subsequent encroachments, but what John had held exclusively; and there was not a spark of evidence that his brothers or sisters had claimed a right to farm the ground on his side of the line except at sufferance; so that a legal presumption of ouster having arisen from a peaceable and an exclusive perception of the profits, it lay upon the plaintiff to rebut it.

In affirmance of another of the plaintiff's points, it was also delivered to the jury, that John was a tenant in common with the others, unless a legal transfer of title was made to him by his father; that under such circumstances, the possession is not presumable to have been adverse; and that lapse of time would not vest an exclusive right in him. His possession, however, may have been adverse, though he were legally seized only in common; and according to Fisher *v.* Prosser, and Frederick *v.* Gray, it might be presumed so from a peaceable and exclusive perception of the profits.

The jury were further instructed in affirmance of another point, that an ejectment brought by Margaret against John in 1818, as soon as the shares of the other children had been decreed to her, prevented the running of the statute from that time; and that the recital in the deed to Eby in 1807, in which John had joined, with other proofs in the cause, repelled any presumption of adverse holding at the date of it. The point was partly irrelevant; for the character of the possession at the institution of the ejectment, had ceased to be material betwixt the parties to the recognizance. If the title to John's part was already dissevered by the statute from the title, to the rest of the intestate's estate, a simple admission of it, as still abiding in those who had been his co-tenants, would not restore it; but if it was not thus dissevered, it passed to Margaret by the confirmation of her election to take the estate at the valuation, and was bound by the recognizance, against which time ran in no shape, but to raise a presumption of payment when the period should arrive. Against Margaret, indeed, the statute might have run to maturity, had it not reached it before; but the land would continue bound by her recognizance without regard to the persons in whose hands the several parts of it might be, or the character of their possession of it as against each other. But this part of the direction, touching as it did an immaterial question, could no further prejudice the defendants, than by confounding the jury and concealing the true point on

[Mehaffy v. Dobbs.]

which the cause turned; yet even that may have done them a substantial injury; and the same may be said of the prayer for direction, that during the pendency of her ejectment, Margaret might disclaim an interest under the decree of the orphans' court: the drift of which is unintelligible.  But the repellant properties ascribed to the recital in the deed to Eby, operating, as they did, if at all, before the decree of confirmation, and before the statute could have run its course, were of decisive importance.  The fact recited is no more than " that Thomas, the father, died seized and possessed of a tract of land in the township, county and state aforesaid, bounded by lands now of David Eby, Gilson Craighead, the Yellow Breeches creek and others:" whence an inference of seisin by the father at the time of his death—a fact entirely consistent with a subsequent adverse possession of a part of it by one of his sons. The time of his death is not stated by any of the witnesses; but it is said in the petition for an inquest, to have been subsequent to 1794.  Still it follows not that John's possession had not become adverse in time to complete the statutory bar at the confirmation in 1818.  But the recital fails to indicate precisely whether the father died seized of the whole, or only of Andrew's part, from which was taken the parcel included in Eby's conveyance.  It may be asked why did John join in the conveyance, if the recital regarded only the latter?  It may have been to confirm the title, and quiet a doubt entertained by the purchaser; or it may have been for any one of a thousand reasons which can not now be imagined.  These recitals, though certainly competent evidence of the fact, yet being usually the work of the scrivener, as was remarked in Good *v.* Good, are entitled to less respect than oral confessions, which are particularly present to the mind of the party at the time.  So far are they from being conclusive, that they are entitled to as little respect by a jury in regard to every thing else, as they were declared in Geddis *v.* Hawke, 1 *Watts* 287, to be entitled in regard to payment of purchase-money.  This recital, therefore, did not necessarily repel the presumption of ouster from perception of the profits; and the prayer for direction in respect to it, ought not to have been granted.

Judgment reversed, and a *venire de novo* awarded.