# Blackmore *against* Gregg.

The 18th section of the Act of 19th April 1794 is applicable only to the personal estate of an intestate, and does not present any bar to the right of an heir to recover the real estate of his ancestor, after the lapse of seven years.

Whether one tenant-in-common entered upon the estate in hostility to, and ousted his co-tenant, is a matter of fact to be determined by the jury.

ERROR to the District Court of *Allegheny* county.

Thomas Blackmore and Jacob Poth against Oliver Ormsby Gregg and Christian Ihmsen. This was an action of ejectment for the third part of thirty acres of land opposite Pittsburgh. A verdict and judgment were rendered for the plaintiff for one-fourth part of the premises; and a writ of error was sued out by each party.

Mrs Jane Ormsby died seised of a tract of land containing sixty or seventy acres on the bank of the Monongahela, between the bridge and Birmingham. She left four children (or their representatives), who, after the death of their father, would be entitled to their mother's estate; *to wit*, Oliver Ormsby, Joseph Ormsby, Mrs. Sidney Gregg, and Mary Ormsby, daughter of John Ormsby, Jr., now Mary Swazy, under whom the plaintiffs claimed.

Joseph Ormsby perished at sea in 1803, having first made his will, devising his estate to a son of Sidney Gregg, who also died intestate; so that Mrs Sidney Gregg and her family were entitled to one-half of the tract, and Oliver Ormsby and Mary Swazy each to a fourth.

John Ormsby, Sen., and his wife, Jane Ormsby, had sold two lots off this tract in her lifetime; and after her death, mistaking perhaps the nature of his title as tenant by the curtesy, he conveyed, at two different times, by deed in fee, to his daughter, Sidney Gregg, thirty-three acres of this tract off the upper end. The Greggs took possession of that end of the tract in the lifetime of John Ormsby, and have held in severalty under those deeds to this day; and when Mary Swazy brought her ejectment against Sidney Gregg for her share, she set up title under these deeds of her father, and held by the Statute of Limitations, and set up a claim to a half of the balance under her mother's title.

After the death of John Ormsby, Sen., his son, Oliver Ormsby, took possession of the balance of this tract, together with the lands which had belonged to his father, and he and his heirs have had the possession since. In 1816, Oliver Ormsby petitioned the

[Blackmore v. Gregg.]

Orphans' Court to divide this tract of sixty acres between him and his sister, Sidney Gregg, but never proceeded further in the matter.

Mary Ormsby, who has always resided in Mississippi, was born in 1791. In 1810, (while yet a minor, under the age of twenty-one,) she married. Her first husband died in 1814, and in 1815 she married Gabriel Swazy.

In 1829, Gabriel Swazy and wife brought an action for partition of this tract, in which a verdict and judgment were rendered for defendants, which were afterwards reversed in the Supreme Court. Nothing further was done in that suit.

Afterwards, in 1830, they brought an ejectment in the United States Court against Mrs Gregg and Oliver Ormsby, in which a verdict was rendered for defendants.

Afterwards, in 1833, they brought another ejectment against Oliver Ormsby alone for her share in the thirty acres now in dispute in this suit, and recovered a verdict and judgment for the one-fourth of this tract. The defendants sued out a writ of error, which was never prosecuted; and the plaintiffs, without proceeding to take possession, conveyed all their title to the plaintiffs in this case, (by deed, dated the 10th of May 1838,) who have instituted this action of ejectment.

The defendant requested the court to charge the jury on the following points.

1. That if they believe from the facts that Oliver Ormsby took possession of the tract in dispute as his own, and did acts thereon indicating such claim and ownership, the jury ought to presume an ouster of defendants.

2. That the taking possession of the land, and the bare perception of the profits from 1805 till the bringing of this ejectment in 1838, in connection with the state of the family of Jean Ormsby at the death of her husband, and the possession of Mrs Gregg of thirty-seven or thirty-eight acres of the whole tract of sixty-two acres, are circumstances from which the jury ought to presume an ouster; especially after 1814, when Mrs Swazy was discovert; and that such presumption would bar the plaintiffs from recovery.

3. That the eighteenth section of the Act of 1794 applies as well to real as personal estate, and presents a complete bar to the recovery of the plaintiffs, they having permitted seven years to elapse without laying their legal claim to the land in dispute.

4. That under that Act, Mrs Swazy (being discovert in 1814) was bound to lay a legal claim to the land in dispute within seven years after her discoverture; and if she has not done so, the plaintiffs cannot recover.

The court below thus instructed the jury:—

GREER, President.—The plaintiffs in this case have shown a good title to at least one-fourth of this land, and will be entitled to recover to that amount, unless the defendants can sustain the

defence which they have now set up, the validity of which we must now consider.

The defendants contend, first—

That the plaintiffs' right of action is barred by the limitation of seven years, contained in the Act of 1794, sect. 18, which is as follows :—" All such of the intestate's relations, and persons concerned, who shall not lay legal claim to their respective shares within seven years after the decease of the intestate, shall be debarred from the same for ever. And provided," &c. &c. It is contended that this Act extends to real as well as personal property, and is, as regards the claims of heirs under an intestate estate, a repeal of the Statute of Limitations of 26th March 1785.

This point has been urged with great learning and ingenuity by the learned counsel for defendants, all of whose ingenious arguments it is unnecessary here to notice; suffice to say, it must strike every one as a strange circumstance, and one powerful reason for doubting the validity of their conclusions, that though it is now near half a century since the passage of the Act in question, this is the first time such a construction has been contended for in a court of justice. It would certainly be a strange anomaly in the policy of the law which would bar a tenant-in-common claiming by descent in seven years, and give a tenant-in-common by purchase twenty-one years.

Besides, this claim must be made within seven years of the death of the intestate (Jane Ormsby), and if John Ormsby had lived one year longer, as none of these heirs could lay "*legal claim*" to their mother's estate during the lifetime of their father, it would necessarily follow that they would all have been barred, and the whole property would have escheated to the state, or belonged to the first occupant.

Suppose a man dies intestate, leaving a tract of land and two sons, who have migrated to Mississippi, and do not return in seven years after their father's death to make "*legal claim*," does the estate escheat, or go to the next of kin as if the sons were dead, or to the first occupant? A very slight view of the whole provisions of this Act, of the preceding and subsequent sections, will at once convince that it is not justly subject to a construction involving such absurd consequences.

It is entitled, "An Act directing the descent of intestate real estates, and the distribution of their personal estates." The first thirteen sections direct on whom real estate shall descend, and how personal estate shall be distributed.

The 14th section directs the order of the payment of the debts of the intestate.

The 15th and 16th provide that the administrator shall not be compelled to make distribution for a year, and that distributees

shall give bond to refund in case debts should afterwards ap-
pear.

The 17th section refers to cases of adminstration *cum testamento
annexo ;* and then comes the 18th section, the one now in ques-
tion, declaring " that all such of the intestate's relations and per-
sons concerned who shall not lay legal claim to their respective
shares," &c.   Respective shares of what?   Lay legal claim to
what?   To the distributive shares just mentioned, not to the
realty certainly ; for the law had cast the inheritance on certain
persons who had become seised by act of law ; it was not vested
in the administrator to be by him distributed in shares to the
heirs : the heir takes by descent, immediately, by act of law, and
if more than one, as tenants-in-common of an undivided interest ;
they may divide among themselves into *shares,* where and how
they please, or they may let it alone ; and the Statute afterwards
provides a way in which one can compel the others to make par-
tition.

It is true that in the previous sections of this Act the undivided
*interest* of the co-heirs has been called their *shares*, whether with
exact etymological accuracy, I shall not stop to inquire ; but the
*real estate is not vested in,* or delivered to an administrator for
distribution.   On whom, then, is this legal claim to be made,
without which the claimant is to be debarred?   The possession
in law, as well as the title, is cast upon the heir, whether he be
in Pennsylvania or Missouri.   Does this Act create a forfeiture,
unless the absent heir make entry or bring ejectment in seven
years? and if so, in whose favour?   Does the commonwealth take
by escheat or forfeiture, or the co-heir, who may have entered in
good faith as tenant-in-common?   If such were the meaning of
this section of the Act, it is strange that more apt phrases could
not have been found to express it.   The eulogies on the legal
accuracy and perspicuity which characterize this Statute, might
surely have been spared if such pregnant consequences have now
for the first time to be discovered, hid under such obscure and
vague phraseology.

But I think the Act is not justly liable to such censure.   The
subject matter of the five preceding sections of the Act, was the
distribution of the personal estate by the administrator.   The
policy of the Act is to limit a time within which the administrator
may be liable to dormant and unknown claims, after he has fairly
paid out the residue in his hands to the known claimants to a
distributive share.   Besides, in seven years a person who has
departed the country, and not been heard from by his friends, is
presumed to be dead : there should, therefore, be some time fixed
when the present and known claimants can compel the adminis-
trator to pay over the money in his hands, and leave him with-
out the apology that he is detaining it for expected or possible
claimants.

II. — 24                        Q *

[Blackmore v. Gregg.]

If, therefore, the words " respective shares" be construed to refer to the subject matter of the sections immediately preceding, which speak of the distribution of the personalty only, there can be no doubt about the grammatical accuracy of the expression in this section, and it is vindicated from the charge of oracular obscurity and absurd consequences.

But even if the construction contended for by defendants were correct, yet the proviso to the Act allows seven years to the claimant clear of disabilities; it is not like the Statute of Limitations, which, when it begins to run, overruns all disabilities, and which has been construed not to allow of cumulative disabilities. In this case, Mary Ormsby, now Mary Swazy, under whom the plaintiffs claim, has never been but one year of her life free from disability of infancy or marriage since the death of her grandmother, in 1799.

You are instructed, therefore, that the first point of defence is not sufficient to bar the plaintiffs' recovery.

The only other ground of defence is the Statute of Limitations. As this depends on matter of fact, and the testimony of the witnesses as to the acts and intentions of Oliver Ormsby, it will be for you to decide it, under the principles now to be stated to you by the court; and this question, on nearly the same facts, has been already tried before me several times, and my opinion has been reviewed and affirmed by the Supreme Court. I shall content myself at this time by repeating the principles of law as then laid down by me, as also the opinion of the Supreme Court on the same subject.

(The Court here read from their own opinion, in 10 *Watts* 164, 5, 6, so far as the opinion does not refer to a state of facts not in evidence in this case; and also the opinion of Sergeant, J. 10 *Watts* 189, 190).

It will be for the jury to say then, from the testimony, whether Oliver Ormsby entered in hostility to the claim of his niece; or whether they can discover, from the acts or declarations of Oliver Ormsby before 1825, any ouster of Mary Swazy; if so, they will find for the defendants; if not, they will find for the plaintiffs.

A question has been made as to what amount you should find for plaintiffs, provided your verdict should be in their favour. Plaintiffs claim that they have shown title to one-half, and that as their ejectment is brought for one-third, they may therefore recover the one-third. Defendants allege that the plaintiffs can only recover something less than a fourth; what proportion that is, they have not elucidated in the argument.

The court instruct you, therefore, if you conclude to find for the plaintiffs, on the principles already stated to you, that you find the *one undivided fourth part* of the premises in dispute.

To these instructions of the court, both plaintiffs and defendants excepted.

[Blackmore v. Gregg.]

Errors assigned :

1. In answering the third and fourth points put by defendants against the defendants.

2. In not answering the second point at all, as required by the statute.

3. In the answer to the second point.

*Dunlop* and *Biddle*, for plaintiffs in error. It has been repeatedly held that the Act of Limitations does not apply in case of a · trust. A fund in the hands of an administrator or executor is an express trust; and, therefore, the 18th section of the Act of 1794, would not be applicable to personal estate, so as to protect the personal representative from the claim of an heir. 14 *Serg. & Rawle* 394; 4 *Watts* 177; 6 *Watts* 379. If, therefore, the Act is not applicable to personal estate, it must have been intended in accordance with all other principles of the intestate laws, to disencumber real estate so as to remove difficulties from the way of its improvement. The use of the words, " heirs," " recover," " hold and enjoy," in the Act, seems to indicate it being applicable to real estate. The word " share" is as often used in Act of Assembly in reference to real as personal estate. The Acts of 1693 — of 1697 — of 1700 — of 1705, in relation to intestate estates, were all referred to, and their phraseology compared with the Act of 1794.

*M'Candless* and *Metcalf*, for defendants in error, contended that the Act of 1794 was applicable exclusively to personal estate, and was intended to enable the personal representative to settle the estate within the time limited by the Act, without the risk of further demand from heirs not known. The policy and system of the intestate laws were all reviewed and examined.

The opinion of the Court was delivered by

SERGEANT, J.—The Act of 26th of March 1785 has been considered as our Statute of Limitations, in respect to real estate, as well for rights accruing by descent, as by other means of acquisition. It has uniformly been the guide on the subject, and estates have been adjusted and divided according to the tenor of its provisions. Its enactments are clear and positive : they embrace rights descended or accrued, and apply to those derived from ancestors and predecessors; and its title is, an Act for the limitation of actions to be brought for the inheritance or possession of real property. It cannot readily be conceived that more than half a century should have elapsed without its having been suggested before, that it was controlled by the provisions of the 18th section of the Act of 1794, had there been any ground for such suggestion. Nor has any satisfactory reason been given, why an heir should have twenty-one years allowed to him, before he is barred of his

[Blackmore v. Gregg.]

right, as against a stranger who takes adversary possession, and yet should be cut off, as against a co-heir, if he makes no claim within seven years.

The truth is, the Act of 1794 was passed for a different purpose. Its object was, as is recited in the title, to provide for the descent of intestates' real estate, and distribution of their personal estates. It proceeds therefore to regulate the descent from the intestate, but there is nothing in it to show that the legislature intended to repeal or modify the Act of 1785. To give it this construction, the words of the Act of 1794 should be clear and positive; yet there is nothing to found an argument upon, but some loose and ill-chosen expressions in the Act of 1794, in which the draftsman has used certain words more appropriate to real than personal estate, such as title accrued, heirs, &c., though at the same time he uses the word *shares*, which has throughout the Act been applied to both real and personal estate; and in the commencement of the section confines it to the intestate's "*relations and persons concerned*," which are applicable, when properly used, to personal estate only. In making the Act of 1794, there was no necessity for a limitation law, as to real estate—that had been fixed by the Act of 1785. The legislature, therefore, say nothing of the Act of 1785, though they repeal expressly the intestate Acts of 1705 and 1764; and re-enact the provisions of the Act of 1705, as to the seven years, with modifications. The Act of 1705, when examined, shows clearly the distinction between real and personal estate, in the minds of the legislature of that day. For, in the 12th section, it provides, in case of *escheat*, for a restoration of the personal estate, where claims are made within seven years after the decease of the intestate by his *relations;* but as to the *heir*, it allows twenty-one years to appear and traverse the inquisition. The construction, then, of the words, *relations and persons concerned,* in the Act of 1705, is obviously confined to the claimants of the personal estate, and the Act of 1794 employs the same terms of which the meaning no doubt had long been established and acted upon.

What was the construction of the Acts passed prior to 1700, of which several have been cited by the counsel for the plaintiff in error, seems not to be very clear. Acts were at that time re-enacted every few years, probably on account of repeals by the king and council. The laws prior to 1700 were all repealed in that year, and none of them have been found since amongst our editions of the laws, except as matters of history. If these ancient enactments did apply to real as well as personal estates, they were soon abandoned as inconvenient; for the *Act of 1705*, which is the year when our Acts of Assembly first began to assume a scientific cast, makes a clear distinction between them; and it has subsisted in general understanding and practice ever since, so far as we have any knowledge on the subject.

[Blackmore v. Gregg.]

We are of opinion that the court below was right in holding that the 18th section of the Act of 19th of April 1794 extends only to the personal estate of the intestate, and that the object of it was to enable the administrator or executor, at the expiration of that period (subject to the savings in the proviso), to pay over to the other representatives of the intestate, the balance in his hands, with safety to himself; in analogy to the same period of time given by other Acts to creditors to make claims, in order to preserve their liens against the estate; and to those which create the presumption of death after an absence of seven years without being heard of.

The second and third errors are not substantiated. The court below stated the principles of law applicable to the case by reading to the jury their own opinion in 10 *Watts* 164, 165, 166, so far as the opinion did not refer to a state of facts not in evidence in this case; and also the opinion of the Supreme Court, 10 *Watts* 189, 190; and then told them it was for them to say from the testimony, whether O. Ormsby entered in hostility to the claim of his niece, or whether they could discover, from the acts or declarations of O. Ormsby before 1825, any ouster of Mary Swazy. I cannot perceive the grounds of the objection to the judge's reading the principles of law from a reported case, where the very doctrine on the subject had been discussed and settled. And according to those principles the question was one of fact, whether Oliver Ormsby had entered in hostility to, and ousted Mrs Swazy, which the judge properly left to the jury to judge of from the whole testimony, and not from a partial view of some of the circumstances of the case, as it appears to have been presented in the defendant's point.

Judgment affirmed.