| 20 | 359 |
| 57 | 110 |
| 20 | 359 |
| 81 | 302 |

## ASHLEY ET AL. vs. RECTOR ET AL.

The Court re-affirms the principles settled in *Rector et al. vs. Gaines et al.*, 19 *Ark.* 71, as to what acts constitute a valid location of a New Madrid certificate, and an appropriation of the public land to the sufferer, or his assignee, etc.

A letter from the surveyor of the public lands of Arkansas, dated 7th July, 1838, addressed to the Recorder of Land Titles of Missouri, stating that an application had recently been made to him for a copy of the survey made by virtue of a New Madrid certificate, and that a copy of said survey was furnished the applicant, with the exception of the meanders of the Arkansas river, is not competent evidence to prove that such a survey was in fact made.

A survey made in 1839, for the purpose of perfecting the location of a New Madrid certificate, would be of no validity as against the rights of one who had previously purchased the land of the Government.

A person obtaining a New Madrid patent certificate on the 16th of June, 1838, and, after another had purchased the land of the Government, should make it appear that the certificate was issued upon a survey and return to the office of the Recorder of Land Titles, etc., made prior to such purchase; otherwise, the presumption is against the validity of the certificate.

Where several persons are tenants in common of a New Madrid claim to a tract of land, and one of them purchases the land of the Government, takes the title in his own name, and, for more than ten years, he, and those claiming under him, hold

360          CASES IN THE SUPREME COURT

Ashley et al. vs. Rector et al.          [May

the land openly and adversely, doing repeated public and notorious acts hostile to the rights of the co-tenants, they are barred by limitation.

Where several persons, in the year 1825, by a written instrument, recognized each other as joint owners of a New Madrid certificate, and agreed to make partition of the title to the land, derived by virtue thereof, one of them was guilty of no fraud upon the rights of the other joint owners, by purchasing the land of the government, in the year 1836, after failure of the parties for so long a time to perfect the New Madrid claim to the land, and after it had been declared invalid by the head of the Land Department of the Government.

Whether a joint owner of the New Madrid claim (under the instrument referred to) could have obtained the benefit of the adverse title, so purchased, if he had filed a bill within a reasonable time, and offered to contribute his due proportion of the expense of purchasing the adverse title, the Court does not decide, as such is not the case before them.

*Appeal from the Chancery Court of Pulaski County.*

Bill and cross-bill determined in the Pulaski Chancery Court,

The bill was filed, 4th May, 1850, by Mary W. W. Ashley, as executrix of Chester Ashley, deceased, and Roswell Beebe, against Henry M. Rector, to quiet title, etc., to the *north-west fractional quarter of fractional section three, south of the Arkansas river, in township one, north of range twelve west,* embraced within the plan of the city of Little Rock.

The complainants claim under Chester Ashley, who purchased the land of the State, on the 8th of June, 1838, as part of the five sections of land granted to the State for the purpose of completing the public buildings, by act of Congress, approved 23d of June, 1836.

On the 26th of August, 1850, Rector filed his answer, making it a cross-bill against the complainants and other persons. The substance of his claim to the land, as set up in the cross-bill, is that a New Madrid certificate, issued to Cockerham, was located on 640 acres of land, embracing the fractional quarter in controversy: That, by a succession of transfers, Ashley, Simpson and Post became the owners of the New Madrid claim, and recognized each other as such by entering into the following agreement:

"It is hereby agreed by and between Justus Post, Robert Simpson and Chester Ashley, as follows, viz: each of the aforesaid persons claim an interest, and have title to a portion of a New Madrid location of six hundred and forty acres, located near Little Rock, by the legal representatives of Henry Cockerham, by virtue of a certificate No. 156, the three aforesaid persons, therefore, hereby agree that all their several claims, on said six hundred and forty acres, shall be united, and the interest derived by virtue of the united claims of all three, shall be so divided that Justus Post shall receive two-fifths of all the interest acquired by the united titles of all three, and the said Robert Simpson and Chester Ashley shall have the residue, to be equally divided between them, the title paper for the said certificate, previous to our own, in the hands of Justus Post. Given under our hands and seals, this 19th February, 1825.

> CHESTER ASHLEY, [SEAL.]
> ROB'T SIMPSON, [SEAL.]
> JUSTUS POST. [SEAL.]"

That on the 17th May, 1838, Post conveyed his interest in the New Madrid claim to Rector.

It is insisted in the cross bill that the New Madrid claim is valid; that Ashley's purchase under the five section act was void; and Rector prays that it may be so decreed, and the 640 acres of land, upon which the New Madrid certificate is alleged by him to have been located, be partitioned between himself, the heirs, etc., of Ashley, and the representatives of Simpson.

The Chancellor decreed that the New Madrid claim was valid, and paramount to Ashley's purchase of the State, and that partition of the 640 acres be made, as prayed in the cross bill, etc.

The complainants in the original bill appealed.

Additional facts in relation to the titles of the parties, the pleadings, evidence, etc., appear in the opinion of this Court.

S. H. HEMPSTEAD and WATKINS & GALLAGHER, for the appellants, argued this cause at length, as to the validity of the New

23

Madrid claim; and contended that there was not a legal loca-
tion of the claim; that there was not any authorized or authen-
tic survey of it, so as to enable the Recorder to act within the
law. No plat was returned to him and recorded.

The appropriation under the New Madrid acts was not com-
plete—an·exchange of titles did not take place until an author-
ized and legal survey was made, returned to the Recorder, was
examined, passed upon, approved and recorded by him—then
the United States assented to the change; and not until then.
*Bagnell vs. Broderick*, 10 *Peters* 446; *Barry vs. Gamble*, 3 *How.*
51; *Lessieur vs. Price*, 12 *How.* 72; *Cabunne vs. Lindell*, 12
*Miss.* 186; Opinion of *Atty. Gen. Cushing* in 1854.

If there had been any actual survey of this claim, that sur-
vey and the plat thereof must have been returned to the recor-
der of land titles at St. Louis, and recorded in his office; and a
copy of the record produced.

The statement of Cross, that there was a survey, is inadmis-
sible; because, what appears of record cannot be shown by a
certificate of the recording officer. *Maguire vs. Sayward*, 9
*Shep.* 230; and the following cases will show that his state-
ment or certificate is no proof of an actual survey. *Mays vs.
Johnson*, 4 *Ark.* 613; *Hill vs. Bellows*, 15 *Verm.* 727; *Greenwood
vs. Spiller*, 2 *Scam.* 502; *Morton vs. Barrett*, 1 *App.* 109; 1
*Greenl. Ev.* 498.

The agreement between Ashley, Post and Simpson in 1825,
for the purpose of uniting their several titles, and then dividing
the same in certain proportions, was *abandoned*. The decision
of the attorney general as to pre-emption and New Madrid
claims south of the Arkansas river, made in 1836, was known:
and it was the general belief that such claims were invalid.

It is to be noted that the agreement was for a mere division
of rights, and did not contain any covenant or obligation on
the part of Ashley to obtain any further title, or take any step
towards that object.

But supposing the agreement to have constituted a tenancy
in common, and that Rector, by his purchase, stood in the place

of Post; yet Ashley, by purchasing from the State, in his own name, disavowed or severed the tenancy, and his holding from that time was adverse. The severance took place in 1838, and the suit was not brought until 1850—twelve years afterwards. The assertion of title by Ashley, under his purchase from the State, was public and notorious—his deed was placed on record, of which Rector, by law, had notice.

If a tenant publicly disclaim his landlord's title, and profess to hold under a hostile title, the statute of limitations will begin to run from the time of such disclaimer. *Angell on Lim.* 513, 507; 2 *McLean* 376.

To make the possession of a tenant in common adverse as against the other, it is not necessary that notice should be given of the adverse intent; but the intent must be manifested by outward acts of an unequivocal kind. *Lodge vs. Patterson*, 3 *Watts* 77; *Gillespie vs. Osborn*, 3 *A. K. Marsh.* 77; *Angell on Lim.* 463, 464; *Willison vs. Watkins*, 3 *Peters* 51; *Leonard vs. Leonard*, 10 *Mass.* 231; *Marcy vs. Marcy*, 6 *Metc.* 360.

One tenant in common, buying a distinct title from the commonwealth, and entering and holding under that title, is an ouster of his co-tenant, and the statute of limitations will run in his favor. 3 *A. K. Marsh.* 72; 13 *B. Mon.* 436. See, also, *Law vs. Patterson*, 1 *W. & S.* 184; *Lewis vs. Robinson*, 10 *Watts* 354; 4 *Watts & Serg.* 251; *Baird vs. Baird*, 1 *Dev. & Bat. Ch.* 524; *Ricard vs. Willison*, 7 *Wheat.* 59; 3 *How. (Miss.) Rep.* 297; 3 *Sumner* 152; 16 *Peters* 455; *Riley's Ch. Cas.* 41; 18 *Ala. Rep.* 50; 21 *Conn.* 379; 7 *Barb. Ch. Rep.* 91; 1 *Lomax* 262.

If the agreement of 1825 should be considered as creating a trust, still a disavowal of it may be made, for it is well settled that if a trustee should deny the right of his *cestui que trust*, and assume absolute ownership of the property held in trust, he abandons his fiduciary character, and the statute begins to run. *Kane vs. Bloodgood*, 7 *Johns. Ch. R.* 90; *Angell* 171; *Robinson vs. Hook*, 4 *Mason* 152.

It is clear, that if any trust relations subsisted, they were severed, *first,* by denial on the part of Ashley; and *second,* by

Rector himself; and after the period of limitation has run, and lapse of time has barred his rights, he cannot go back to revive a tenancy which he then repudiated; or set up a trust which was then destroyed. *Burhaws vs. Van Zandt*, 7 *Barb.* 91.

As to the right of the appellants to rely upon lapse of time, as a bar to the claim set up in the cross bill, see 7 *Eng. Law & Eq.* 141; *Taylor vs. Adams ad.* 14 *Ark.* 65; *Hunt vs. Wickliffe*, 2 *Peters* 201; *Waller vs. Huff*, 5 *Humph.* 91; *Cuyler vs. Brodt*, 2 *Cain Cas. E.*; 1 *Dev. & Bat.* 325; 3 *Yerg.* 205; 3 *Humph.* 462; 5 *Ib.* 290; *Avery vs. Holland*, 2 *Overton* 71; *Angell & Ames on Lim.*, sec. 429.

In every or any adjudged case that can be produced, where tenants in common are held to be trustees of the title under which they entered or hold, and bound to protect that title for their common benefit, it does and must appear as an assumed fact, that there was *a title*, under which they lawfully might hold possession. Those or any such cases can have no application to a case where there never was any lawful possession, and *no title*, or right to a title in anybody. Confessedly, this land remained the property of the United States until June, 1838, or until patented in 1840, under a State location, distinct from, and adverse to the supposed New Madrid claim. Unless that claim is shown to have been a valid one, and the superior claim, a contract about this land was not one made between tenants in common, but between trespassers or intruders; not about lands which they held in common, but about public lands of the United States, in respect of which they could not make any valid contract at all.

Upon the broad equity of this case, we submit that the agreement, executed in 1825, between Ashley, Post and Simpson, respecting their supposed claims to this New Madrid location, was virtually at an end in 1836, when, according to the decisions of the General Land Office, it became understood that New Madrid locations, south of the Arkansas river, had no vitality, and it was not, therefore, any violation of the agreement, either in law or in morals, for Ashley to set about

OF THE STATE OF ARKANSAS. **365**

TERM, 1859.]                    Ashley et al. vs. Rector et al.

acquiring a perfect title, a wholly independent title to himself ; and the general doctrine of equity, requiring good faith between tenants in common, has no just application to a case of this kind, where there was no title, out of the Government, in any body to this land, and no right to the possession of it; because, unless the supposed New Madrid claim was a valid one, according to the uniform course of decisions of this Court (*Floyd vs. Hicks,* 14 *Ark.* 291; *Wynn vs. Morris,* 16 *Ark.* 434; *Wynn vs. Garland, Ib.* 452) the possessors under it would be mere squatters, intruders or trespassers.

CUMMINS & GARLAND, FOWLER & STILLWELL, for the appellees, also argued this case at length, as to the validity of the New Madrid claim.

The statute of limitations was insisted on at the hearing, to defeat the claim of Rector. In answer to this, it is unnecessary to say more than that, if the pleading was such as to let in that defence, there is no proof of adverse possession, by any of the appellants. The only evidence of possession, in the case, is Col. Ashley's answer, in which he admits that he held it with the other owners of the New Madrid claim.

And the statute never runs, until there is actual adverse possession. *Brown vs. Kimball,* 25 *Wend.* 267.

As against the appellees, his co-tenants, the defence is not available to Ashley and those claiming under him. *McClung vs. Ross,* 4 *Cond.* 608; *Bradstreet vs. Huntingdon,* 5 *Pet.* 440; *Boone vs. Chiles,* 10 *Pet.* 233; *Smart, etc. vs. Waterhouse,* 10 *Yerg.* 104; *Patten vs. Overton,* 8 *Humph.* 196; 3 *How.* (*U. S.*) *R.* 688.

Adverse possession will never be presumed, but must be clearly proved. *Smoot vs. Wathen,* 8 *Mo. R.* 525; *Jackson vs. Sharpe,* 9 *Johns.* 167; *Jackson vs. Waters,* 12 *Ib.* 368; *Grafton vs. Grafton,* 8 *S. & M.* 87.

They commenced this suit themselves, and cannot now be permitted to defeat the defence, or any relief claimed in the

cross-bill, by setting up the statute. *Adams vs. Taylor*, 14 *Ark.* 68.

As to Col. Ashley and his heirs and devisee, and Beebe, who claims through him, it was unnecessary to enquire whether the New Madrid certificate was properly located or not. Col. Ashley, by the contract or agreement entered into by and between him and Justus Post and Robert Simpson, on the 14th of February, 1825, assumed relations and took upon himself duties to them, that he could not throw aside, and relieve himself from, when he saw fit. He became a trustee for them and Rector and Chambers' heirs, claiming by purchase through them.

It does not lie in their mouths, to say, that the location was irregular, that it was not made by a legally authorized person or that it was not made at all; or that the chain of title from Cockerham down to Post and Simpson is not perfect. That agreement closes the door, they are stopped from going behind it.

Whether their title was legal, equitable, or no title at all, Ashley was bound to protect it; and whatever subsequent title he acquired inured to their benefit as well as his own. *Patton vs. Ashley*, 8 *Ark.* 290, *et seq.*; *Massie vs. Watts*, 2 *Cond.* 339; *Hallett vs. Collins*, 10 *How.* (*U. S.*) *R.* 182; *Russell vs. Ashley et al., Hempstead's R.* 704; *Morgan vs. Boon et al.*, 4 *Monroe* 297; *Morrison's Ex.*, 5 *Ib.* 435; *Green vs. Winter*, 1 *Johns. Ch. R.* 36; *Piatt vs. Oliver et al.*, 2 *McLean R.* 267; *Andrews et al. vs. Jones*, 10 *Ala.* (*N. S.*) 471; *Threadgill vs. Pintard* 12 *How.* (*U. S.*) 24; 5 *Johns. Ch. R.* 407; 2 *B. & P.* 298; 15 *Ark.* 312.

Ashley having attempted to defraud his co-tenants, and secure the entire estate to himself, lost all claim to contribution from them, for money he paid to the State. And if this was not the case, the pleadings are not so framed as to admit of a decree in favor of those claiming under him; nor is there any evidence that he ever paid a cent. See *Russell vs. Ashley et al., Hempstead's R.* 704.

Hon. THOMAS JOHNSON, Special Judge, delivered the opinion of the Court.

The first point that we consider necessary and proper to settle in this case, relates to the sufficiency of the location under the New Madrid claim of Cockerham, to constitute an appropriation of the land in controversy. The decision of this question will necessarily depend upon the construction that shall be placed upon the act of Congress, of February 17th, 1815. That act provides that any person owning lands in the county of New Madrid, in the Missouri Territory, according to the extent said county had on the 10th of November, 1812, and whose lands had been materially injured by earthquakes, should be authorized to locate the like quantity of land on any of the public lands of the said territory, the sale of which was authorized by law. No person was allowed to locate a greater quantity that might be confirmed to him, and in no case to exceed 640 acres; but the owners of lots or tracts of land injured, and less in quantity than one hundred and sixty acres, were permitted to locate any quantity, not exceeding that number; with a proviso, that in every case where such location should be made according to the provisions of that act, the title of the person or persons, to the lands injured, as aforesaid, should revert to, and become absolutely vested in the United States. The claimant was required to satisfy the Recorder of Land Titles, by the oath of one or more competent witnesses, that he was entitled to a tract of land under the provisions of that act, and upon being satisfied of his right to make such location, in lieu of that injured, it became the duty of the Recorder to issue a certificate for that purpose, to the claimant. The certificate thus issued might then be located, on the application of the claimant, by the principal deputy surveyor, for said Territory, or under his direction: and it was made his duty to cause a survey thereof to be made, and to return a plat of the same to the Recorder, together with a notice in writing, designating the tract or tracts thus located, and the name of the claimant, and which plat and notice the Recorder was required to spread upon the records of

his office.   It was then made the duty of the Recorder to trans-
mit a report of the claims allowed, and locations made, under
the act, to the Commissioner of the General Land Office, and
to deliver to the party a certificate, stating the circumstances
of the case, and that he was entitled to a patent for the tract
therein designated.   That certificate the claimant was required
to file with the Recorder within twelve months from its date,
and thereupon the Recorder was to issue a certificate in favor
of the party, which certificate, being transmitted to the Com-
missioner of the General Land Office, entitled him to a patent,
to be issued in like manner as was provided for other public
lands of the United States.   The Supreme Court of the United
States, in the case of *Bagnell vs. Broderick*, (13 *Peters Reports*,
436, *et seq*.,) whilst passing upon said act of Congress, said:
" The United States never deemed the land appropriated until
the survey was returned, for the reason that there were many
titles and claims, perfect and incipient, emanating from the pro-
vincial governments of France and Spain, and others from the
United States, in the land district where the New Madrid claims
were subject to be located.   So there were lead mines and salt
springs excluded from entry.   Then again, the notice of entry
might be in a form inconsistent with the laws of the United
States, in all which cases no survey could be made in confor-
mity with it.   The location referred to in the act, is the plat
and certificate of survey returned to the Recorder of Land Ti-
tles; because, by the laws of the United States, this is deemed
the first appropriation of the land, and the Legislature of Mis-
souri has no power, had it made the attempt, to declare the
notice of location filed with the Surveyor General, to be an
appropriation contrary to the laws of the United States."
And in *Barry vs. Gamble*, (3 *How. Rep.* 84;) when speaking
of the Recorder's certificate to Lesseur, for 640 acres of land,
in compensation for land injured by the earthquake in New
Madrid county, the court said: " On this, the survey of ·April,
1815, is founded.   Its return by the surveyor, with a notice of
location, to the Recorder, was the first appropriation of the land,

and not the notice to the Surveyor General's Office, requesting a survey to be made, as the court held in the case of *Bagnell vs. Broderick*, 13 *Peters Rep.* 450; and again in *Lesseur vs. Price*, 12 *How. U. S. R.* 60., the court said that a New Madrid location, though a professed bounty to, and at the option of persons whose lands were injured, is nevertheless upon a consideration, being an exchange of lands. The title of the injured lands does not revert to the United States according to the terms and obvious construction of the act of 1815, until the location is completed, by the return of the survey, and notice to the Recorder of Land Titles, and a record of it made in his office; and until this is done no title is divested out of the United States, or vested in the locator, and the land remains the property of the United States, subject to be appropriated, etc., and the court further say, in that case, that this is the meaning of the Statute of Missouri, authorising those claiming lands by New Madrid locations, to maintain ejectment; that is to say, a location, which is an appropriation of the land perfected in the Recorder's Office, when the exchange of titles takes place.— This court, in the case of *Rector et al. vs. Gains, et al.* 19 *Ark.* 86, when commenting on these authorities in connection with the New Madrid act, said: " The true question on the point, is not what is a location in general, or what is, in general, the proper signification of that word; but what is the location contemplated by the New Madrid acts? and we feel constrained to hold, that according to these authorities, and not, as we think, at all inconsistent with the plain language of the acts, and certainly in accordance with a safe and wise policy on the part of the government, that location was the actual survey and return of the plat by the surveyor to the Recorder. Until such return and its approval, on the part of the government, there was no commencement of right or title to the land applied for, no severance of it from the public domain. Then, for the first time, rights to the respective lands exchanged vested respectively. Before that point of time, either party could recede. It was a standing offer on the part of the government, which the New

Madrid sufferer might accept or not at his election.   If he elected to accept it, that election was shown, not by the acts of the party above, but by the concurrence in the act on the part of the government, upon the terms and in the mode prescribed by the act of Congress tendering the bounty.   Until this concurrence thus manifested, no rights could vest, cognizable in a court of justice.   If any arose, in honor and conscience, they rested in entreaty.   The Government undertook to dispose of her own lands upon her own terms.   If the New Madrid sufferer undertook to acquire them under the offer on the part of the Government, he could do so only when those terms were fully complied with, whether within his own control or not.   Until then the Government did not part with her lands, nor he acquire them—no rights vested, cognizable in a court of Justice.   If intermediate the application of the New Madrid sufferer for the benefits of the act of Congress, and pending the needful steps resulting, when completed, in securing the bounty of Congress, the Government should sell, patent, or take in reserve for the uses of the Government, the land applied for and contemplated to be acquired by the New Madrid sufferer, no legal rights were invaded, because none had been created under the terms of the act of Congress, of the provisions of which the sufferer had sought in vain to avail himself; that very contingency having been contemplated, according to the construction of the act in making this bounty subordinate to the paramount policy of the Government in reference to the disposition of the public lands, and the security of land titles; and especially, the Supreme Court say, in the quotation already made, because there were many titles and claims, perfect and incipient, emanating from the provincial governments of France and Spain, and others from the United States, in the land district where the New Madrid claims were subject to location.   So there were lead mines and salt springs excluded from entry.   Then again, the notice of entry might be in a form inconsistent with the laws of the United States; in all which cases no survey could be made in conformity to it.   Hence, if vested rights were al-

lowed to grow up, previous to the return and approval of the survey, a great field of litigation would be opened, which sound policy dictated should not be done; an evil which is beginning to be too sensibly felt in the land States, in reference to the policy and construction of the pre-emption laws of Congress, as expounded by the Supreme Court, at Washington, whereby confidence in land titles derived from the Government has been, in no little degree, impaired. Nor was there any hardship at all comparable with this great evil, growing out of the sounder policy of the New Madrid acts, which vested no rights, and hence allowed either party to recede from the contemplated exchange of lands at any time previous to the final consummation of the proffered exchange, by the return and approval of the survey, afterwards to be perfected by grant on the part of the government."

We will now proceed to apply these tests to the New Madrid claim under consideration. We have carefully examined the transcript filed in this court, but have been unable to discover such a state of facts as the law requires to constitute a valid location and appropriation of the land in controversy under that claim.

Exhibit M, of the answer and cross-bill of the defendant, Rector, presents a certificate, purporting to have been issued by the Recorder to Henry Cockerham, or his legal representatives, under date of the 30th of November, 1815, by which authority is given to locate 640 acres of any of the public lands in the Territory of Missouri, the sale of which was authorized by law; and also a selection of that amount of land made by Wm., O'Hara, dated October 20th, 1820, and in which he requested an order of survey. It also contains a letter from Edward Cross, as surveyor of public lands of Arkansas, under date of July 7th, 1838, addressed to F. R. Conway, esq., Recorder of Land Titles, St. Louis, Mo., in which he states that an application had recently been made to him for a copy of the survey made by virtue of New Madrid certificate numbered 156, in the name of Henry Cockerham, or his legal representatives, for

640 acres of land, and that a copy of said survey was furnished the applicant, with the exception of the meanders of the Arkansas river. When the survey referred to was made, or by or for whom, does not appear, nor can that document be received as evidence that a survey was in fact made, since it is utterly destitute of every requisite necessary for such a purpose. It does not purport to be a certified copy of such survey, and it is also fatally defective in not appearing to have been approved and recorded in the office of the Recorder of Land Titles. It was, therefore, entitled to no consideration as an instrument of evidence, and consequently should have been excluded by the Chancellor. The survey of C. E. Moore, bears date of May 2d, 1839, and even upon the presumption that such survey was authorized by law, and could have served as a basis for the claim of Cockerham to rest upon, yet it is obvious that it could not so operate in the present case, as the land in dispute had been previously appropriated by Chester Ashley, under the five section act. It is inadmissible as evidence, for the further reason that there is no showing that it ever was filed, approved and recorded by the Recorder of Land Titles, as required by the New Madrid act. The record also exhibits certain documents, purporting to be transcripts from the General Land Office, and which were admitted by the Chancellor, against the objection of the defendants in the cross-bill. These consist of a patent certificate, issued on the 16th June, 1838, a selection by Wm. O'Hara, of 640 acres, under a location certificate previously issued to Henry Cockerham, numbered 156, and dated October 20th, 1820, and also a plat of survey and designation of the tracts, without date, over the signature of Edward Cross, surveyor of public lands.

We think that these transcripts were wholly inadmissible, upon the clearest principles of evidence. The patent certificate is manifestly predicated upon the plat and designation, which appears to have been forwarded to the Recorder of Land Titles, by Edward Cross, surveyor of public lands for Arkansas. There is nothing to show at what time, or by whom, or

for whom the supposed survey and designation were made, nor does it appear at what time it was put upon the record in the office of the Recorder. The patent certificate having issued on the 16th June, 1838, and the certificate of the Recorder appended to the transcript bearing the same date, and it not appearing at what time the supposed survey was received or recorded, the presumption is against the party for whose benefit it is offered, as the law presumes that if the fact actually existed he would have made it appear at a date sufficiently early to preclude all adverse claims. In the absence of any showing to the contrary, the law will intend that it was put upon the record at the latest possible period of time that the facts of the case will warrant, and that is the 16th June, 1838. Taking that to be the true time, and which, under the rules of pleading, we are bound to do, it follows that it was too late to vest the title in the defendant, Rector, as the General Government had previously parted with all her interest by the entry of Chester Ashley, under the five section grant. The next and only remaining question, which we deem it necessary to discuss, relates to the legal effect of a certain instrument of writing entered into by Justus Post, Robert Simpson and Chester Ashley, and bearing date of February 14th, 1825. It was agreed by and between those parties, that each of them claimed and had title to a portion of a New Madrid location of 640 acres, which were located near Little Rock, by the legal representatives of Henry Cockerham, by virtue of a certificate No. 156, and that all their several claims on said 640 acres, should be united, and their interest so divided that Justus Post, should receive two-fifths of all the interest acquired by the united titles, and that Robert Simpson and Chester Ashley should have the residue to be equally divided between them. There can be no doubt but that each of the parties to that instrument, from the instant of its execution and acceptance, became tenants in common of the lands described in it, and consequently held the same in trust for each other in virtue of that relation. It is contended that Ashley, being thus affected with a trust, could not locate

the whole for his individual benefit, but that his entry under the five section grant inured to the common benefit of all. The question then to be determined is, whether that relation still subsists, or is it dissolved by the subsequent act of Ashley.

The Supreme Court of Alabama, in the case of *Abercrombie vs. Baldwin, et al.*, said: " A tenant in common, from the nature of the estate, must, if in the enjoyment of his rights, be in the possession of the whole; consequently the seizin of one such tenant, who admits, or does not deny, the title of his co-tenant, may be considered the seizin of all. *Knox vs. Silloway*, 1 *Fairf. Rep.* 201; *Shosinway vs. Holbrook*, 1 *Pick.* 114. One tenant in common may oust his co-tenant. *Hoffsletter vs. Blottner*, 8 *Miss. Rep.* 276; *Mason vs. Ferish*, 1 *Scam.* 495. But whether such tenant entered upon the estate claiming an exclusive right, and ousted his co-tenant, is a question of fact. *Blackmore vs. Gregg*, 2 *Watts & Serg.* 182. In *Law vs. Patterson*, 1 *Watts & Serg.* 184, it was decided that an entry upon and possession of the whole of the land by one tenant in common, as if it had been his exclusive property, and the receipt of the rents and profits thereof, without accounting to his co-tenant for any part thereof, or proof of a demand to do so, amounts to an ouster. So, an ouster will be presumed between tenants in common, in favor of one who has had peaceable possession and received the profits for the length of time which the statute of limitations prescribes as a bar. *Mehoffy vs. Dobbs*, 9 *Watts* 363. A co-tenant may be ousted by denying or resisting his rights, or by excluding him from the enjoyment of the property. *Brackits vs. Norcrop*, 1 *Greenl.* 89; *Thomas vs. Pickering*, 1 *Shep.* 337. If the tenant who is out of possession submits to the exclusive occupancy of his co-tenant, commenced with the intent to hold in severalty, until the expiration of the period prescribed by the statute of limitations as a bar to an action, he cannot recover. *Gillaspie vs. Osburn*, 3 *A. K. Marsh.* 77. Although possession by one tenant in common will not *per se* constitute an adverse possession against his cotenants; but if, by a notorious act, he claims an exclusive right,

even under a void title, his possession becomes adverse, and the statute of limitations will run. *Jackson vs. Tibbits*, 9 *Cow.* 241; *Clapp vs. Bromagher, Ib.* 530. A silent possession, accompanied by no act which can amount to an ouster, or give notice to his co-tenant of his intention to exclude him, will not make a possession adverse. *McClung vs. Ross*, 5 *Wheat.* 116. In *Willison vs. Watkins*, 3 *Pet.* 51, it was said that the relation between tenants in common is, in principle, very similar to that between lessor and lessee, the possession of the one is the possession of the other. But if one ousts the other, or denies his tenure, his possession becomes adverse. *Weld vs. Oliver*, 21 *Pick.* 559—*and other cases cited.* The Supreme Court of Alabama, in the case of *Johnson et al. vs. Toulmin et al.*, referring to the case of *Abercrombie vs Baldwin*, said: "This Court held as the principle deducible from many authorities cited in the opinion of the late Chief Justice, that the possession of one tenant in common may become antagonistic, and exclusive of a co-tenant, and will become so by an unequivocal and notorious denial of the right of his co-tenant. If one tenant in possession retains the whole, and denies the title of his co-tenant to any part of the land, it amounts to an ouster. 11 *East, Doe vs. Bird*, 47; *Doe vs. Prosser, Cowp.* 217. It is undoubtedly true as a general proposition, that the possession of one joint tenant, or tenant in common, is the possession of his co-tenant, and is regarded as in support of their common title (see 2 *Cruise of Real Property, by Greenl.* 273); but it is equally well settled that one tenant in common may disseize another. What acts, however, shall constitute such disseizin, or ouster, is not so well agreed upon by the authorities. The simple fact that one tenant in common receives the whole profits, is not sufficient to divest the possession of his co-tenant. *Willison vs. Watkins*, 3 *Pet.* 51; *Chambers vs. Chambers*, 3 *Hawks.* 332; 2 *Greenl. Cruise* 393. Neither are acts of ownership necessarily to be construed in tenancies in common as acts of disseizin. It is said to depend upon the intent with which they are done, and their notoriety, as affording evidence of

notice as to the adverse character of the possession.  In testing
a defence founded on possession, courts of justice direct their
attention to the time during which it has continued, and its
character.  The latter respects its notoriety, the nature of the
occupation, and especially the intention with which it is taken
and continued.  If it be a naked possession, not accompanied
with any claim of right, it will never constitute a bar, but will
enure to the advantage of the true owner.  It is possession in
his right, and for his benefit.  The law presumes, until the con-
trary be shown, that a man in possession without title, intends
to hold for the true owner; in other words, that he intends to
hold honestly, so far as he can consistently with holding at all.
So, if he have a title as tenant in common, he is presumed to
hold for himself and his co-tenant; and, in either case, if his
possession be in fact wrongful; in other words, adverse, or ex-
clusive, so as to make a statute bar, he must show this in a
course of proof, or show that it is admitted by his adversary in
pleading.  24 *Wend.* 596, *Humbert vs. Trinity Church.*  Now,
although a man who may hold possession rightfully as a tenant
in common, presumptively refers himself to that right, yet the
contrary may be shown; and if his conduct be such as to satisfy
the mind that he means to hold out his co-tenants, and he does
in fact exclude them, this is an ouster, and his possession from
that time becomes adverse, within the meaning of the statute
of limitations, equally so as if he had never any right to claim
as tenant in common.  It by no means follows, therefore, that
even had the deed from Cornelius expressly mentioned his right
as tenant in common, the defendants were necessarily tied up
to hold in that relation.  They might at any moment break the
connection by openly disavowing it, and from that time the
statute of limitations would begin to run.  In *Gill* 276, the
Court of Appeals of Maryland said, it is a settled principle in
the law, apparently of all the States, that title to lands from
the commonwealth draws the seizin or actual legal possession
to it; so that one who has title derived out of the State is, by
force of his title, in possession until an ouster, or disseizin is

committed by some one entering upon the land with a claim of possession adversely to him; and for which they refer to *Smith's Leading Cases* 413; *Hoye vs. Swan's Lessee,* 5 *M. D.* 253. It is well settled that although the statute of limitations does not apply to any demand purely equitable, yet courts of equity acting according to legal analogies, adopt it in cases analogous to those in which it applies at law. *Statham vs. Barnston,* 11 *Ves.* 453. But where the remedy at law and in equity is concurrent, the statute of limitations applies alike to both forums. *Peay ad. vs. Badgett, January Term,* 1859, *and cases there cited.* These authorities, and the cases referred to in them, may suffice to show, that even in cases where the title is complete in the tenants in common, there are circumstances under which an adversary claim to the entirety may be set up by one of the tenants, so as to bar the rights of his co-tenant by the operation of the statute of limitations; and for a much stronger reason may such claim be established where there is an utter failure of the common title.

The original bill alleges that Chester Ashley made his entry under the 5th section grant, on the 8th June, 1838; that he caused his certificate of purchase to be recorded in the Recorder's office of the county of Pulaski, in the State of Arkansas, on the 17th of December, 1839; and that having sold one undivided half of the land in controversy to Roswell Beebe, on the 11th of January, 1840, they, on the 1st day of May, of the same year, caused the whole tract to be surveyed, subdivided and laid off into blocks and lots, as an addition to, and extension of the city of Little Rock; and that from the time of said entry, he, and those claiming under him, had held uninterrupted and peaceable possession of the land, as well actual as constructive. The location and entry under the five section claim is abundantly proved by the exhibits; and that Ashley sold one half of the land to Beebe, and that they subdivided the same into blocks and lots, and went on to make sale of the same, as stated in the bill, is admitted by the answer of the defendant, Rector. Here, then, is an open, notorious and unequivocal act

24

on the part of Ashley, as far back as the 8th June, 1838, by which he appropriated the entire quarter section to his individual and exclusive benefit. From that period of time to that of his death, he never has conceded that he held possession as a tenant in common; but, on the contrary, that he claimed and controlled it as his own exclusive property. There can be no question, therefore, but that his entry under the five section claim, amounted to a disseizin and actual ouster of his co-tenants; and that, consequently, the statute of limitations began to run in his favor from that instant. But it has been intimated that the representatives of Ashley cannot claim the benefit of the statute of limitations, since they have not put it in issue by a direct plea. The first section of the act provides that "No action for the recovery of any lands or tenements, or for the recovery of the possession thereof, shall be maintained, unless it appear that the plaintiff, his ancestor, predecessor, or grantor, was seized or possessed of the premises in question within ten years before the commencement of such suit. It would be difficult to conceive in what other manner Beebe and the representatives of Ashley, in framing their bill to quiet their title to the land in controversy, could have availed themselves of the benefit of the statute bar. They do not occupy the attitude of defendants, whose title or possession has been attacked by suit, so as to require them to interpose their grounds of defence by plea; but, on the contrary, they appear upon the record as complainants setting forth a title, and calling upon Rector, as the defendant, to come forward and make profert of his, if he has any to exhibit. In deraigning their title, as the groundwork of their bill, they urge that Ashley, on the 8th June, 1838, entered the land in controversy under a five section claim, and that he, and those claiming under him, went immediately into possession, and have had a continuous, peaceable and uninterrupted possession ever since. The entry, as has already been shown, was such as to amount to an ouster of his co-tenants; and it is not denied, but expressly admitted by the answer, that they actually took possession by causing the whole tract to be

surveyed, and proceeding to the sale of portions of the same. It was not necessary, in this case, that they should have alleged or shown an actual possession of the premises, as the title, the moment it accrued, drew the possession with it, and co-extensive with the limits of the tract. The entry of Ashley under the five section grant, was made on the 8th June, 1838, and the suit was not instituted until the 4th of May, 1850, a period of near twelve years, and there is no showing that Rector held adversely to them within that entire period, or that he has done any act, by instituting suit or otherwise, which could impose upon them the necessity of exhibiting their title, within the period of limitation. We deem it well worthy of remark, in this connection, and in addition to what has been said in reference to the entry of Chester Ashley, under the five section grant, and the statute bar that has grown up from his possession under it, that the facts as presented by the record do not sustain the allegation of fraud in the acquisition of the land in controversy. It does not clearly appear at what precise period of time, but it is supposed to be about 1820, when he first became interested in the Cockerham claim. From that time until 1836, when it was finally determined, by the Land Department at Washington, that that claim was void, and that it could not be made available as an appropriation of the land, he continued to control and hold possession of the same, and if not before, certainly from 1825, as a tenant in common for the benefit of Simpson, Post and himself. It was not until he had held possession and controlled the land under the New Madrid claim for some eighteen years, and when he had become fully satisfied that he could control it no longer under that claim, that he abandoned it, and sought to avail himself of the five section grant. The Cockerham claim having been thus declared void by the only tribunal then authorized to pass upon it, and having from that time been virtually abandoned, and surrendered, as utterly invalid and worthless, he most unquestionably was at liberty to buy in an outstanding title, for his own benefit, and that without subjecting himself to the impu-

380          CASES IN THE SUPREME COURT

                    Ashley et al. vs. Rector et al.                    [MAY

tation of fraud. What might have been the result in case that his co-tenants under the Cockerham claim, had have presented themselves, within a reasonable time after his entry under the five section grant, and have offered to make contribution, we will not now decide, as that question is not presented by the record.

From a full review of the facts of this case, and a careful examination of the law applicable to them, we are satisfied that there is error in the decision of the Court below, and that, therefore, the same ought to be reversed. It is, therefore, ordered, adjudged and decreed, the decree of the Chancellor of Pulaski county, herein rendered, be and the same is hereby reversed, with costs, that the cross bill of defendant, Rector, be dismissed for want of equity, and that the complainants in the original bill be quieted in their title, and possession of the land described and claimed in their said bill, and it is further ordered that the decree herein rendered be certified to the said Court of Chancery of Pulaski county, and be there executed according to law.

Mr. Justice RECTOR did not sit in this case.